**UNITED STATES of America, Appellee,**

**v.**

**Angelo AMEN, Mark A. Deleonardis, Michael Paradiso and Oreste Abbamonte, Jr., Appellants.**

Nos. 1167, 1120, 1168, 1169, Dockets 87–1028, 87–1034, 87–1040, 87–1049.

United States Court of Appeals, Second Circuit.

Argued June 15, 1987.

Decided Oct. 7, 1987.

Lawrence H. Schoenbach, New York City, for appellant Amen.

Michael P. Joseph, New York City (Joseph & Stalonas, New York City, of counsel), for appellant Deleonardis.

John L. Pollok, New York City, (Todtman, Hoffman, Epstein, Young, Goldstein, Tunick & Pollok, P.C., Charles L. Weintraub, New York City, of counsel), for appellant Paradiso.

Richard B. Mazer, San Francisco, Cal. (Law Offices of Richard Mazer, David A. Nickerson, of counsel), for appellant Abbamonte, Jr.

Annmarie Levins, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., for the Southern District of New York, Steven A. Standiford, Kenneth Roth, Asst. U.S. Attys., of counsel), for appellee.

Before OAKES, MESKILL, and PRATT, Circuit Judges.

OAKES, Circuit Judge:

Angelo Amen, Mark Deleonardis, Michael Paradiso, and Oreste Abbamonte, Jr., four of fourteen original defendants in a twenty-three count indictment, appeal convictions entered in the United States District Court for the Southern District of New York, Robert L. Carter, Judge. Following denial of their suppression (and certain other) motions in *United States v. Vasta*, 649 F.Supp. 974 (S.D.N.Y.1986), appellants Amen and Deleonardis pleaded guilty to all the counts in which they were named, including Count One, alleging a conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846 and Counts Five through Ten and Counts Six through Nine respectively charging Deleonardis and Amen with distributing heroin. Abbamonte, Paradiso, and six other codefendants were convicted after a jury trial, Abbamonte of Count One, the conspiracy count, Count Three, operating a continuing criminal enterprise in violation of 21 U.S.C. § 848, and Counts Seven and Eight, distributing heroin. Paradiso was convicted on Counts One and Four, Count Four charging aiding and abetting Abbamonte in the operation of his continuing criminal enterprise in violation of 21 U.S.C. § 848 and 18 U.S.C. § 2.

On January 14, 1987, Judge Carter sentenced Amen to a twenty-year prison term on Count One, to run consecutively to a nine-year prison term imposed by David N. Edelstein, United States District Judge, on July 22, 1986, for Amen's conviction in *United States v. Delvecchio and Amen*, 86 Cr. 305 (S.D.N.Y.), *aff'd in part, rev'd in part*, 816 F.2d 859 (2d Cir.1987). In addition, Judge Carter sentenced Amen to concurrent twenty-year terms on Counts Seven and Eight. On the same day, Judge Carter sentenced Mark Deleonardis to a twenty-year prison term on Count One, a consecutive five-year prison term on Count Six, and concurrent twenty-year prison terms on each of Counts Five, Seven, Eight, Nine, and Ten. Judge Carter also imposed lifetime special parole on Deleonardis.

On January 15, 1987, Judge Carter sentenced Abbamonte to life imprisonment on Count Three and imposed concurrent forty-year prison terms on each of Counts One, Seven, and Eight. In an endorsement dated January 16, 1987, Judge Carter corrected the judgment to reflect his intention to impose the sentence on Count One consecutive to the term that Abbamonte was already serving for 1983 narcotics convictions. On January 15, 1987, Paradiso received consecutive twenty-year prison sentences on Counts One and Four.

The evidence establishing a heroin enterprise run from the federal penitentiary at Lewisburg, Pennsylvania, consisted primarily of communications taped under the prison monitoring system. Paradiso and Abbamonte argue that the trial court improperly denied their motion to suppress these tapes (hereinafter the "Lewisburg tapes"). Abbamonte argues that there was insufficient

evidence to establish that he operated a continuing criminal enterprise because the Government failed to establish that he acted in concert with five or more persons with respect to whom he occupied the position of organizer, supervisor, or manager. He contends that the only properly admitted evidence related to four such persons. Paradiso argues that he should not have been convicted for aiding and abetting Abbamonte's continuing criminal enterprise because (A) he was not chargeable with such an offense, (B) the court's instruction on aiding and abetting was erroneous, and (C) the evidence was insufficient to prove that he aided and abetted Abbamonte in the management and operation of a continuing criminal enterprise. Abbamonte also argues that he was denied effective assistance of counsel by virtue of a denial of a motion for adjournment. Amen and Deleonardis argue that their sentences violate the Eighth Amendment prohibition against cruel and unusual punishment. Abbamonte and Paradiso argue, and the Government concedes, that they should not have been sentenced on Count One, the conspiracy count, unless their respective convictions for operating a continuing criminal enterprise ("CCE") and aiding and abetting such operation are overturned. *United States v. Aiello,* 771 F.2d 621, 632–35 (2d Cir.1985); *United States v. Osorio Estrada,* 751 F.2d 128, 134–35 (2d Cir. 1984), *cert. denied,* 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985). We affirm as to all appellants except that we reverse the judgment against Paradiso for aiding and abetting Abbamonte's CCE and we "combine" Abbamonte's conviction for conspiracy into the greater offense of CCE in accordance with *Aiello* and *Osorio Estrada.*

## FACTS

Although the principal evidence in the case pertains to the Lewisburg heroin enterprise, evidence of Abbamonte's involvement in a supervisory capacity in heroin trafficking in 1982 and 1983 was introduced as proof that he operated a CCE. On October 20, 1982, a Drug Enforcement Administration ("DEA") undercover agent purchased from Abbamonte and Joseph Delvecchio three kilograms of heroin and made arrangements on November 3, 1982, to purchase seventeen more. This resulted in the seizure of nine kilograms and Abbamonte's and Delvecchio's arrest. Both were jailed at the Metropolitan Correction Center ("MCC"). One of Abbamonte's

most frequent visitors was Amen and one of Delvecchio's was his brother, Richard. Later Richard also visited Abbamonte. On several occasions, Amen and Richard visited Abbamonte together. In April 1983, another member of the conspiracy, Lorenzo DiChiara, began cooperating with the Government and was released from the MCC. After DiChiara's release, Richard Delvecchio and Amen repeatedly approached him to buy drugs. On May 14, 1983, in the presence of a DEA agent, Delvecchio and Amen expressed a desire to purchase ten kilograms of heroin at $195,000 per kilogram, taking five kilograms on credit. The drug agent, purporting to be the nephew of the supplier of the nine kilograms of heroin which had been seized, claimed that they still owed his uncle money for the seized heroin. Amen argued that his organization, the Abbamonte organization, should be charged only $80,000 per kilogram for the seized heroin but the agent disputed that his uncle had ever agreed to a reduction in price. An agreement was made to purchase five kilograms of heroin for $190,000 each, but the sale never took place, apparently because Richard Delvecchio and/or Amen suspected surveillance. Eventually, Abbamonte pleaded guilty to two substantive narcotics violations and to conspiracy to distribute heroin. Testimony by undercover and surveillance agents, as well as Abbamonte's guilty plea allocution, established that he supervised, managed, and organized Joseph Delvecchio during the two 1982 heroin transactions with the undercover agent.

The Lewisburg heroin enterprise, as to which there was ample proof, was discovered after a defendant in an unrelated narcotics case began cooperating with the Government. He told a DEA agent that his cousin, Lawrence Jackson, an inmate at the Lewisburg Penitentiary, was coordinating heroin transactions from inside the prison. With the assistance of the cooperating defendant, DEA Special Agent Charles Howard established contact with Jackson; DEA Special Agents Ruth Beaver and Livia Adams, posing as Agent Howard's girlfriends, received telephone calls from Jackson. Sixty-seven tapes made by these three agents were introduced into evidence.

In addition, prison officials made 130 tapes of conversations of Abbamonte and Paradiso with their codefendants. In these tapes, as well as in the Jackson tapes, various codes referred to drug transac-

tions: "lawyers" indicated sources of heroin and "going to court" or similar expressions referred to heroin transactions. Indeed, when one heroin dealer refused to make repeated sales to Agent Howard, Jackson agreed to find him another "lawyer." In December 1984, Jackson promised to put Agent Howard in contact with a source of heroin known as "F. Lee Bailey." The "F. Lee Bailey" source, the evidence indicated, was the organization of appellant Abbamonte.

On January 5, 1985, appellant Mark Deleonardis, acting on instructions from Abbamonte and identifying himself as "your friend from Lewisburg," quoted Agent Howard prices for various amounts of heroin and suggested a meeting. Shortly thereafter, Jackson confirmed that Deleonardis was "F. Lee Bailey." On January 11, 1985, Deleonardis met Agent Howard at a hotel in Queens. Deleonardis indicated that Abbamonte, his "friend at Lewisburg," had told him to provide Agent Howard with "quality heroin." On February 7, 1985, he sold 129 grams of heroin to Agent Howard for $32,500 cash. Three days later, Jackson called Agent Howard to report that "F. Lee Bailey" was pleased with the deal. On February 12, and again on February 20, Deleonardis visited Abbamonte at Lewisburg. On February 14, Agent Howard complained to Jackson about the quality of the heroin he had bought. Jackson indicated that he would talk to "the one that was doing the research on this end." He also agreed to provide samples in the future.

On March 6, 1985, Deleonardis brought a sample of heroin to Agent Howard on a boat owned by the DEA fully equipped with videotape and soundtrack. At this meeting, Deleonardis told Agent Howard that Abbamonte insisted that the next few deals take place in New York rather than in Washington. On March 15, 1985, Deleonardis sold 112 grams of heroin to Agent Howard in New York for $32,500 in cash, the heroin supplied to Deleonardis by appellant Amen at the Skyline Motel in Manhattan. Again, on April 10, 1985, Deleonardis sold Agent Howard 108 grams of heroin supplied by Amen. Deleonardis explained to the agent that his "friend," Abbamonte, had agreed to give Howard heroin on credit, so that for $70,000 cash he could get one-half kilogram or $140,000 worth of heroin. On May 10, 1985, Deleonardis sold 249 grams of heroin to Agent Howard for $48,000. Appellant Amen, along with codefendant Philip Vasta, whose appeal was withdrawn, supplied the heroin. The next day, Abbamonte called Deleonardis, who assured him that the deal had gone as planned.

The evidence also indicated that Abbamonte was having difficulty controlling Amen. In a series of conversations with Deleonardis and a codefendant, Arnold Squitieri, Abbamonte complained that Amen continued to deal with certain people despite Abbamonte's order that Deleonardis, not Amen, do so. On April 27, 1985, Abbamonte had Deleonardis give him Amen's address and told Deleonardis that Amen was "going to the . . . hospital." A few days later Abbamonte informed Squitieri that Amen was going to get a beating because he refused "to stop." On May 9, 1985, Paradiso called codefendant Richard Romano and gave him Amen's address, telling him to "take care of it" and to make sure he got "Jimmy" to help. During the next few days Romano and others waited outside Amen's apartment building. Apparently he had learned of the plan and gone into hiding.

Another heroin sale was scheduled for August 15, 1985. However, Deleonardis detected surveillance and did not complete the deal. He told Abbamonte that he would no longer deal with Agent Howard. Paradiso called Romano and instructed him to meet with Deleonardis. On the evening of August 15, Abbamonte told Deleonardis that Romano would take care of Agent Howard. On August 16, Deleonardis and Romano visited Abbamonte and Paradiso at Lewisburg. Jackson later called Agent Howard and said that "another lawyer" from "the same firm" would do business with him.

On September 6, 1986, while Deleonardis waited with Agent Howard, Romano took $150,000 and went to pick up the heroin. After an eight-hour delay, he delivered 451 grams of heroin. He also returned $25,000 because he was not able to get the 1½ kilograms that Agent Howard was expecting. The evidence showed that the heroin was supplied by a person known as "The Curl." On September 10, Deleonardis and Romano visited Abbamonte and Paradiso at Lewisburg.

The Government also introduced evidence seized from various defendants, including heroin, cocaine, $5.6 million, narcotics records, drug paraphernalia, address

books, and beepers, as well as testimony pertaining to Vasta's heroin trafficking.

## DISCUSSION

### I. *Denial of the Motions to Suppress the Lewisburg Tapes*

Abbamonte and Paradiso argue that the district court erred in denying defendants' motion to suppress the Lewisburg tapes. They contend that recording the telephone conversations violated Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–20, and the Fourth Amendment of the United States Constitution. Abbamonte also maintains that the inadvertent destruction of some of the Lewisburg tapes should lead to the suppression of the rest. The Government argues that Title III procedures do not apply to prison conversations and that there is no Fourth Amendment privacy interest preventing security-motivated interception of telephone conversations made at Lewisburg. The Government also maintains that even if Title III applies to prison communications, under 18 U.S.C. § 2511(2)(c) it is not unlawful for "a person acting under color of law to intercept a wire or oral communication, where ... one of the parties to the communication has given prior consent to such interception."

■ Title III clearly applies to prison monitoring. *United States v. Paul,* 614 F.2d 115, 117 (6th Cir.), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980); *Campiti v. Walonis,* 611 F.2d 387, 392 (1st Cir.1979); *Crooker v. United States Dep't of Justice,* 497 F.Supp. 500, 502 (D.Conn.1980); *see also United States v. Figueroa,* 757 F.2d 466, 472 (2d Cir.1985) (assuming Title III procedures for wiretap orders apply to prison surveillance). However, we agree with the Government that the monitoring in this case fell within the consent exception to Title III.[1] The legislative history shows that Congress intended

the consent requirement to be construed broadly. The Senate Report specifically says in relation to section 2511(2)(c): "Consent may be expressed or implied. Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2182. Indeed, the Senate Report cites a line of cases allowing recording or eavesdropping by government agents or informers who were parties to a conversation or who are allowed to listen by explicit consent of a party to the conversation. *Id.* (citing *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952)).

Here we imply consent in fact from surrounding circumstances indicating that the appellants knowingly agreed to the surveillance. *See United States v. Rantz,* No. 85–40036–04, slip op. at 9 (D.Kan. Sept. 30, 1985) (available on WESTLAW, DCT database); *but see Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 581 (11th Cir.1983) (use of telephone with knowledge of capability of monitoring not implied consent where participant told personal calls not monitored except to extent necessary to determine whether call is personal or business); *Campiti v. Walonis,* 611 F.2d at 393–94 (use of telephone did not constitute implied consent where participants unaware that call was monitored and no regulations or notices informed inmates that calls might be monitored); *Jandak v. Village of Brookfield,* 520 F.Supp. 815, 820 n. 5 (N.D. Ill.1981) (consent cannot be implied in law where participant did not but reasonably should have known that line was monitored); *Crooker v. United States Dep't of Justice,* 497 F.Supp. at 503 (knowledge of

---

1. The district court concluded that Title III did not apply to the monitoring of inmate conversations at Lewisburg because it was conducted "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). *United States v. Vasta,* 649

F.Supp. 974, 989 (S.D.N.Y.1986). We do not pass judgment on the applicability of this exception except so far as to express our reservation that the prison officials monitored the calls in the ordinary course of their duties.

monitoring not sufficient to establish consent).

 Paradiso and Abbamonte impliedly consented to the interception of their telephone calls by use of the prison telephones. They were on notice of the prison's interception policy from at least four sources. The Code of Federal Regulations [2] provides public notice of the possibility of monitoring. In addition, inmates receive actual notice. First, upon first arriving at Lewisburg and upon returning to the institution after an absence of nine months or more, each inmate must attend an admission and orientation lecture in which the monitoring and taping system is discussed. Second, every inmate at Lewisburg receives a copy of *The Inmate Informational Handbook* which as of September 1984 contained the following notice about the taping system:

> Telephones at the United States Penitentiary, Lewisburg are located in each housing unit and are turned on every other day on a rotating basis. The phones are in operation Monday through Friday from 8:30 AM until 11:15 PM, excluding counts; on weekends and holidays from 8:15 AM until 11:15 PM, excluding counts. These phones utilized by the inmates are MONITORED and TAPED as well as having the capibility [sic] for VISUAL TAPING.

*Handbook* at 9 (Sept. 1984 ed.) (capitalization in original). Third, notices were placed on each telephone, stating in English and Spanish the following:

### NOTICE

The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring. A properly placed telephone call to an attorney is not monitored.

*See Figueroa,* 757 F.2d at 472, 474 (sign over telephone notified prisoners that calls might be monitored).

Evidence indicated appellants received actual notice of the monitoring and taping process. When Abbamonte returned to Lewisburg on October 16, 1984, after being incarcerated at Danbury, he attended an admissions and orientation lecture and received a copy of *The Inmate Informational Handbook.* Moreover, prison records indicate that on October 8, 1984, Paradiso's case manager presented him with a form containing the written notice of the monitoring and taping system, which Paradiso refused to sign.

Thus, the district court properly found that the two defendants had notice of the interception system and that their use of the telephones therefore constituted implied consent to the monitoring. *United States v. Vasta,* 649 F.Supp. at 990 n. 2.

 Appellants' argument that taping their conversations violated the Fourth Amendment is also not compelling. As the Supreme Court construes the Fourth Amendment, prison inmates have no reasonable expectation of privacy. *See Hudson v. Palmer,* 468 U.S. 517, 527–28, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984); *United States v. Cohen,* 796 F.2d 20, 22–23 (2d Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). In the prison context the reasonableness of a search is directly related to legitimate concerns for institutional security. *See Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984); *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). If security concerns can justify strip and body-cavity searches, *see Bell v. Wolfish,* 441 U.S. at 558–60, 99 S.Ct. at 1883; *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986), and wholly

---

**2.** 28 C.F.R. § 540.100 provides:
 Inmate telephone use is subject to limitations and restrictions which the Warden determines are necessary to insure the security, good order, and discipline of the institution and to protect the public. The Warden shall establish procedures and facilities for inmate telephone use.
 28 C.F.R. § 540.101 provides:

 The Warden shall establish procedures that enable monitoring of telephone conversations on any telephone located within the institution, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. The Warden must provide notice to the inmate of the potential for monitoring.

random cell searches, *see Block v. Rutherford,* 468 U.S. at 589–91, 104 S.Ct. at 3234–35; *Hudson v. Palmer,* 468 U.S. at 530, 104 S.Ct. at 3202, then surely it is reasonable to monitor prisoners' telephone conversations, particularly where they are told that the conversations are being monitored. *See United States v. Roy,* 734 F.2d 108, 111 (2d Cir.1984), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986) (legitimate privacy expectations "severely curtailed" during incarceration); *Christman v. Skinner,* 468 F.2d 723, 726 (2d Cir.1972) (monitoring detainees' conversation with visitors not violative of privacy right).

█ Nor was the district court in error when it held that sanctions should not be imposed on the Government because a government agent inadvertently destroyed twenty-seven of the approximately 253 Lewisburg tapes. The district court's finding of negligence, as opposed to wilfulness, is fully supported by the record. When pursuant to subpoena prison officials turned over approximately 253 tapes, a DEA agent provided the officials with blank replacement tapes. When the replacement tapes proved defective, the agent returned twenty-seven of the original tapes produced under but not covered by the subpoena. The Government concedes that at least some of the twenty-seven returned tapes probably contained conversations involving appellants and thus were subject to discovery under Federal Rule of Criminal Procedure 16(a)(1)(A). The appropriateness and extent of sanctions therefore depends, as we held in *United States v. Grammatikos,* 633 F.2d 1013 (2d Cir. 1980), "upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." *Id.* at 1019–20. The district court found that the Government did not act deliberately or in bad faith. *United States v. Vasta,* 649 F.Supp. at 993. Asserting that "it is most difficult for us to imagine how the lost recordings could be helpful to defendants," *id.,* the

court found no significant prejudice. We do not quarrel with that finding.

## II. *Abbamonte's Continuing Criminal Enterprise*

█ Abbamonte concedes that the evidence established his supervision of four persons but argues that since the Government did not meet the requirement of 21 U.S.C. § 848 that he acted in concert and organized, supervised, or managed five persons, he must be acquitted of this offense. *See Burks v. United States,* 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). We agree with the Government, however, that the historical evidence relating to Abbamonte's 1982–83 operations with Joseph Delvecchio satisfies the missing element. Appellant argues that the sole evidence presented by the Government to establish that he acted in concert with and organized, supervised, or managed Joseph Delvecchio, was derived from the facts underlying Abbamonte's 1983 conspiracy conviction and that use of that prior conspiracy conviction or the facts underlying it in a later prosecution for operating a CCE violates the double jeopardy clause of the Fifth Amendment. *See Ohio v. Johnson,* 467 U.S. 493, 501, 104 S.Ct. 2536, 2542, 81 L.Ed.2d 425 (1984); *Brown v. Ohio,* 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977) (double jeopardy forbids successive prosecutions for greater and lesser offense). We agree with the Government that the district court properly admitted facts underlying Abbamonte's 1983 conspiracy and substantive narcotics convictions and correctly instructed the jury on its use.

Even if the Government were somehow precluded from using the 1983 conspiracy conviction to satisfy the "in concert" element of section 848, it nevertheless could use his 1983 convictions for substantive offenses for this purpose. *United States v. Boldin,* 772 F.2d 719, 731 (11th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986). *See also United States v. Stricklin,* 591 F.2d 1112, 1123–24 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Any error in admitting the conspiracy conviction was

necessarily harmless since evidence that Abbamonte organized, supervised, or managed Joseph Delvecchio during two 1982 heroin transactions also proved two substantive narcotics violations. Moreover, evidence in this case showed that the crimes to which Abbamonte pleaded guilty in 1983 were but a small part of the enterprise that operated from on or about June 1, 1981, to on or about August 26, 1986.

■■■■ Congress intended CCE to be a separate offense. *Garrett v. United States,* 471 U.S. 773, 784, 105 S.Ct. 2407, 2414, 85 L.Ed.2d 764 (1985). Moreover, the double jeopardy clause does not preclude prosecution for both the predicate offenses and the CCE offense, even when prosecution for a CCE offense follows conviction for one of the predicate offenses. *Id.* at 784–86, 793, 105 S.Ct. at 2414–15, 2419. Congress did not intend to authorize cumulative penalties under the drug conspiracy section, 21 U.S.C. § 846, and the CCE section, 21 U.S.C. § 848, *Jeffers v. United States,* 432 U.S. 137, 157, 97 S.Ct. 2207, 2219, 53 L.Ed.2d 168 (1977); *United States v. Mourad,* 729 F.2d 195, 202 (2d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), so that a defendant found guilty of both a conspiracy and a CCE may not be sentenced more than the maximum authorized by section 848. *United States v. Mourad,* 729 F.2d at 202. However, "[t]he same is not true of the substantive offenses created by the Act and conspiracy, and by the same logic, it is not true of the substantive offenses and CCE." *Garrett v. United States,* 471 U.S. at 794, 105 S.Ct. at 2420. Since this case involves substantive offenses and a CCE, evidence underlying Abbamonte's 1983 conviction involving his supervision of Delvecchio establishes the missing fifth person thereby permitting prosecution of Abbamonte for CCE.

### III. *Aiding and Abetting a Continuing Criminal Enterprise*

■■■■ Paradiso received consecutive prison sentences of twenty years each for his convictions for conspiracy and for aiding and abetting Abbamonte in the operation of his CCE under 21 U.S.C. § 848. While the Government concedes that employees of a CCE cannot be punished for aiding and abetting the head of the enterprise, *see United States v. Ambrose,* 740 F.2d 505, 507 (7th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), it insists that non-employees who knowingly provide direct assistance to the head of the organization in supervising and operating the criminal enterprise can be so punished. Paradiso asserts, however, that because section 848 applies only to a person in charge of a CCE, one cannot incur liability for aiding and abetting such a person. We agree with Paradiso.

Congress enacted section 848 as a part of the Comprehensive Drug Abuse Prevention and Control Act of 1970 to target the ringleaders of large-scale narcotics operations. *United States v. Valenzuela,* 596 F.2d 1361, 1367–68 (9th Cir.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979); *United States v. Webster,* 639 F.2d 174, 180 (4th Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). This "carefully crafted prohibition aimed at a special problem .... [was] designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers." *Garrett v. United States,* 471 U.S. at 781, 105 S.Ct. at 2413. When Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense. *See Gebardi v. United States,* 287 U.S. 112, 123, 53 S.Ct. 35, 38, 77 L.Ed. 206 (1932) (acquiescing woman not guilty of aiding and abetting Mann Act violation); *United States v. Farrar,* 281 U.S. 624, 634, 50 S.Ct. 425, 427, 74 L.Ed. 1078 (1930) (liquor purchaser not guilty of aiding and abetting illegal sale). Here Congress defined the offense as leadership of the enterprise, necessarily excluding those who do not lead.

In its original form, section 848 was primarily a sentencing enhancement provision. H.R. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4649. If a defendant committed a felony "as part of a pattern of conduct which was criminal under applicable laws of any jurisdiction, which constituted a sub-

stantial source of his income, and in which he manifested special skill or expertise," the prosecuting attorney could file with the court an instrument specifying that the defendant fell in the category of a special offender thereby instituting special sentencing procedures. *Id.* at 4648–49 (quoting S. 30, 91st Cong., 2d Sess. 1001). However, the original provisions of the CCE section were not in the bill as finally reported. The Association of the Bar of the City of New York and others objected that these provisions allowed sentencing to be imposed without providing a defendant with an opportunity to cross-examine persons providing information as to the continuing criminal offense. *Id.* at 4650–51. An amendment offered by Representative John D. Dingel and adopted by the Interstate and Foreign Commerce Committee corrected the defects in the original sentencing bill. "Instead of providing a post-conviction-presentencing procedure, it made engagement in a continuing criminal enterprise a new and distinct offense with all its elements triable in court." *Id.* at 4651. While the amendment "improved the continuing criminal activity section," *id.* at 4651, several members of the committee cautioned "candor requires that it be pointed out that this section still contains serious objections," including the failure adequately to define a "continuing series of violations," or to explain what is meant by deriving "substantial income or resources." They observed that "the very severe penalty of the continuing criminal enterprise ... is applicable to a broad range of criminal activities, some of which are very mild." *Id.* at 4651–52. Finally, they worried that mandating a minimum penalty would make it necessary, in the case of a minor offender, either to find him not guilty or to impose a mandatory ten-year sentence. *Id.* at 4652–53.

While the legislative history makes no mention of aiders and abettors, it makes it clear that the purpose of making CCE a new offense rather than leaving it as sentence enhancement was not to catch in the CCE net those who aided and abetted the supervisors' activities, but to correct its possible constitutional defects by making

the elements of the CCE triable before a jury.

Not only does the Government's distinction between mere employees and those who otherwise "help" the kingpin lack support in legislative history but it also seems totally unworkable. How does one determine whether a person is an employee or third party? What of the businessman who leases a boat to a CCE engaged in importation? What about the kingpin's bodyguard? Or his lawyer? Ultimately, a subordinate may have all the attributes of a third party and render even greater assistance to the kingpin, yet escape enhanced criminal responsibility because it depends solely on the degree of control exercised by the kingpin over the individual. Normally we would assume that in enacting a later statute (section 848) Congress had the earlier one (section 2) in mind and we would reconcile the two if we could, but we do not believe it possible to do so here and still remain faithful to the plain terms and clear intent of section 848.

Thus, we believe that to be punished under section 848 one must meet all the requirements for a conviction under section 848. The Government did not establish these requirements in Paradiso's case. Consequently, we reverse his Count Four conviction.

### IV. *Amen's Sentence*

 Amen pleaded guilty to one count of conspiracy to possess and distribute heroin and two substantive counts of possession and distribution. He was sentenced to concurrent twenty-year terms on each count to run consecutively to a nine-year term previously imposed on him for conspiracy and distribution of heroin in the earlier incident involving Abbamonte and others. Amen argues that imposition of the maximum sentence of twenty years was arbitrary and capricious in light of his guilty plea and his status as a "lesser member of the conspiracy." He also argues that it was "excessive" to make his twenty-year terms consecutive to his previous nine-year term which he claims arose out of the same factual conspiracy. Both of these

claims are meritless. Indeed the Government is correct that the court omitted to impose an additional three-year special parole term in violation of 21 U.S.C. § 841(b)(1)(B).

■ Amen's only real objection is to Judge Carter's statement that: "I suppose that it's unfortunate that all of you are before a judge who finds the plague that narcotics has caused to people and families and neighbors intolerable." While this statement clearly indicates Judge Carter's predisposition to sentence narcotics offenders heavily, the statute gives him this latitude. Moreover, he made the statement in the context of determining the weight to be given the personal remorse expressed by the defendants who, after all, were engaged in large-scale heroin purchases and sales over a long period of time. The case is thus distinguishable from *United States v. Wardlaw*, 576 F.2d 932, 936–38 (1st Cir. 1978), where a judge imposed a large sentence on a first-time drug carrier primarily because of its presumed effect on large-scale drug smugglers.

As to the imposition of consecutive sentences, this case does not contain the "extraordinary set of circumstances" necessary to demonstrate that consecutive sentences are cruel and unusual. *See United States v. Golomb*, 754 F.2d 86, 90 (2d Cir. 1985). Although Amen's prior conviction also involved business with Abbamonte, the time periods and membership of the two conspiracies as charged in the indictment were distinct.

### V. *Mark Deleonardis' Sentence*

■ Deleonardis pleaded guilty to one count of conspiracy under 21 U.S.C. § 846, and six counts of distribution and possession with intent to distribute. He was sentenced to twenty years on Count One, an additional five years on Count Six, twenty years each on Counts Seven through Ten concurrently with Count One, a fine of $350, and lifetime parole. He now argues that this sentence violates the Eighth Amendment, citing *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and quoting statistics regarding average sentences in the Southern District of New York and elsewhere. The evidence Deleonardis presents is similar to that in *United States v. Ortiz*, 742 F.2d 712 (2d Cir.), *cert. denied*, 469 U.S. 1075, 105 S.Ct. 573, 83 L.Ed.2d 513 (1984), where we upheld a ten-year prison term plus ten-year parole sentence for conviction of a single count of possession of heroin with intent to distribute. Even without considering the statistical evidence, Deleonardis' total twenty-five year sentence for seven separate counts seems eminently reasonable in comparison to *Ortiz* and some of the cases cited therein. *Ortiz*, 742 F.2d at 717. Unpersuaded by Deleonardis' Eighth Amendment argument, we affirm his sentence.

### VI. *Other Issues*

Abbamonte argues that he was denied effective assistance of counsel because the district court denied his motion for adjournment. He contends that this deprived counsel of adequate time to prepare for trial and, in particular, to review the tape recordings. We disagree.

The trial judge has broad discretion in deciding whether to grant a continuance. *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983). Only an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* at 11–12, 103 S.Ct. at 1616 (citing *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)).

■ That is not this case. Judge Carter exercised sound discretion in denying Abbamonte's motion for adjournment. The Government provided Abbamonte with tapes of the conversations it intended to use at trial and with adequate access to the original Lewisburg tapes. The trial record demonstrates that Abbamonte received the effective assistance of counsel.

■ Finally, Abbamonte and Paradiso argue, and the Government concedes, that they should not have been sentenced on Count One, the conspiracy count, unless their respective convictions for operating a

CCE and aiding and abetting such operation are overturned. We agree. Thus, in accordance with *United States v. Aiello,* 771 F.2d 621 (2d Cir.1985); *United States v. Osorio Estrada,* 751 F.2d 128 (2d Cir. 1984), *cert. denied,* 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985), we "combine" Abbamonte's conviction for conspiracy into the greater offense of CCE. Since Paradiso's aiding and abetting conviction is reversed, however, his conspiracy conviction and sentence therefor stand.

Judgment in accordance with opinion.