**UNITED STATES of America,
Plaintiff,**

v.

**Mario FAULKNER (01), Maurice Anthony Peters (02), Antonyo Ladarrell Rodgers (03), Defendants.**

No. 03–20191–JWL.

United States District Court,
D. Kansas.

July 8, 2004.

Theodore J. Lickteig, Overland Park, KS, for Defendant Mario Faulkner.

Rekha Sharma–Crawford, Sharma–Crawford Attorneys at Law LLC, Overland Park, KS, for Defendant Maurice Anthony Peters.

Stephen B. Chapman, Chapman & White LLC, Olathe, KS, for Defendant Antonyo Ladarrell Rodgers.

R. Shawn Streepy, Office of United States Attorney, Kansas City, KS, for Plaintiff United States of America.

## MEMORANDUM AND ORDER

LUNGSTRUM, Chief Judge.

On December 10, 2003, a grand jury returned an indictment charging Mario Faulkner, Maurice Anthony Peters, and Antonyo Ladarrell Rodgers each with one count of unlawfully attempting to kill and to murder and to use physical force against a federal witness and one count of conspiring to commit the same crime. Defendants filed various pretrial motions, and the court held a hearing on those motions on May 28, 2004. The matter is now before the court on Mr. Faulkner's motion to suppress (Doc. 72), motion to dismiss the indictment (Doc. 73), and motion to sever (Doc. 74). Defendant Rodgers has joined in these motions

For the reasons set forth fully below, the court denies the defendants' motions. First, the court denies defendants' motion to suppress recorded conversations allegedly intercepted in violation of the Federal Wiretapping Act because at least one of the parties to those conversations impliedly consented to the monitoring and recording. Second, the court denies the motion to dismiss the indictment based on preindictment delay because defendants did not show actual prejudice stemming from this delay, and they did not demonstrate that the delay was motivated by the government's desire to gain a tactical advantage or to harass defendants. Finally, the court denies the motion to sever because the defendants' have failed to demonstrate that they will be prejudiced by the joinder of all parties.

## BACKGROUND

In 1998, Demetrius Hargrove was a pretrial detainee at the Corrections Corporation of America ("CCA") detention facility located in Leavenworth, Kansas. Mr. Hargrove was awaiting trial on federal charges of kidnapping and using and carrying a firearm during and in relation to a crime of violence.

The government alleges that on or about December 31, 1998, and January 1, 1999, Mr. Hargrove made telephone calls from CCA to defendants Mario Faulkner, Maurice Anthony Peters and Antonyo Ladarrell Rodgers to arrange for the murder of Shedrick Kimbrel, a witness in Mr. Hargrove's pending trial. These conversations were recorded by officials at CCA.

Based on this alleged conduct, a grand jury indicted Mr. Faulkner, Mr. Peters, and Mr. Rodgers with one count of unlaw-

fully attempting to kill and to murder and to use physical force against an individual with the intent to prevent him from attending and testifying in an official proceeding, and one count of conspiring to kill and to murder and to use physical force against an individual with the intent to prevent him from attending and testifying in an official proceeding. The grand jury returned the indictment under seal on December 10, 2003. The indictment was unsealed on February 2, 2004.

## DISCUSSION

Defendant Faulkner has filed three separate motions requesting various relief. First, he seeks to suppress the recordings of telephone calls Mr. Hargrove placed while in custody at CCA, arguing that they were obtained in violation of the Federal Wiretapping Act. Second, he moves to dismiss the indictment, alleging that the government's preindictment delay has violated his due process rights. Finally, Mr. Faulkner moves for a severance from his fellow co-defendants under Federal Rules of Criminal Procedure 14. Defendant Rodgers joins in these motions. The court addresses each motion in turn.

## I. Motion to Suppress Recorded Conversations

The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* sets forth certain limitations on government interception and recording of private conversations. Title III of the Act generally prohibits the unauthorized interception of "any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

The Act "protects an individual from all forms of wiretapping except when the statute specifically provides otherwise." *Abraham v. County of Greenville,* 237 F.3d 386, 389 (4th Cir.2001).[1] "Although the argument has been made that Title III was not intended by Congress to apply to prisons, it is well accepted that its protections do apply to that context." *United States v. Hammond,* 286 F.3d 189, 192 (4th Cir.2002) (citing *United States v. Van Poyck,* 77 F.3d 285, 291 (9th Cir.1996); *United States v. Feekes,* 879 F.2d 1562, 1565 (7th Cir.1989); *United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987)). Congress has further provided that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial...." 18 U.S.C. § 2515.

Defendants argue that CCA officials unlawfully intercepted Mr. Hargrove's conversations. The government, on the other hand, argues that CCA lawfully intercepted the conversations pursuant to the law enforcement exception and the consent exception to the federal wiretapping act.

## A. The Law Enforcement Exception

■ The law enforcement exception excludes from the definition of "interception" recordings made by "any telephone or telegraph instrument, equipment or facility, or any component thereof...being used by...an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). Con-

---

1. Initially, the government argued that Mr. Faulkner had not established standing to challenge the intercepted communications because he did not stipulate that he was a participant in the recorded telephone conversations. In his reply, however, Mr. Faulkner concedes for the limited purposes of this hearing that his voice does appear on two recordings dated December 31, 1998. *See Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (holding that when a defendant testifies in support of a motion to suppress evidence, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection).

gress most likely carved out an exception for law enforcement officials to make clear that the routine and almost universal recording of phone lines by police departments and prisons, as well as other law enforcement institutions, is exempt from the statute. *See First v. Stark Cnty. Bd. of Comm'rs*, No. 99–3547, 2000 WL 1478389 (6th Cir. Oct.4, 2000).

Defendants do not contest the fact that CCA officials recorded the conversations in the "ordinary course" of their duties. Instead, they argue that CCA officials are not "investigative or law enforcement officials" under the Act. The court agrees.

As noted above, the law enforcement exception applies only to an "investigative or law enforcement officer" in the ordinary course of his duties. Congress defined the terms "investigative or law enforcement officer" as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses." 18 U.S.C. § 2510(7). Thus, as a condition precedent to invoking the law enforcement exception, the plain language of the statute requires both that an individual be: (1) an officer of the United States or of a State or political subdivision thereof; and (2) empowered to conduct investigations of or to make arrests for offenses enumerated in the wiretapping statute. Here, the government's evidence does not satisfy either requirement.

CCA officials are private individuals, not officers of the United States or of a State or political subdivision thereof. While the government established that CCA and the United States Marshals Service share a contractual relationship, the nature and scope of this agreement is not in evidence. At the evidentiary hearing, Andre Ford, CCA's Chief of Security, testified that CCA houses federal inmates and pretrial detainees pursuant to an agreement with the United States Marshals Service. The government, however, did not offer this agreement as an exhibit, and Mr. Ford's testimony did not address what, if any, power, duties or authority the United States Marshals Service delegates to CCA officials under their agreement. Thus, the record does not clarify whether CCA officials are deputized as United States Marshals or otherwise placed in privity with marshals under the agreement, or instead, whether CCA officials retain their status as private employees. Similarly, based on the current status of the record, it is unclear whether CCA officials are empowered (by law or contract) to investigate or make arrests for offenses enumerated in the Act. The lack of such evidence is fatal to the government's attempt to invoke the law enforcement exception. As noted above, the plain language of the Federal Wiretapping Act defines "investigative or law enforcement officers" as officers of the United States who are empowered to investigate or make arrests. 18 U.S.C. § 2510(7). The law enforcement exception, in turn, applies only to investigative or law enforcement officers who intercept conversations in the ordinary course of their duties. 18 U.S.C. § 2510(5)(a)(ii). Without evidence that demonstrates that CCA officials are "investigative or law enforcement officers" under the plain meaning of the Act, the government cannot invoke the protections of the law enforcement exception.

This result is consistent with the holding in *Huguenin, v. Ponte*, 29 F.Supp.2d 57 (D.R.I.1998). In *Huguenin*, plaintiffs were inmates· at the Donald W. Wyatt Detention Facility ("Wyatt") in Central Falls, Rhode Island. *Id.* at 59. Defendant Cornell Corrections, Inc. ("Cornell"), was a private corporation that operated Wyatt during the relevant time period. *Id.* Plaintiffs' complaint alleged that defendants vio-

lated the wiretapping act by intercepting calls placed while they were in custody. Defendants attempted to invoke the protections of the law enforcement exception. Plaintiff's, however, contended that the defendants were private entities that did not fall within the Act's definition of "investigative or law enforcement officer[s]." *Id.* In response, the defendants argued that Wyatt's employees assumed the duties and responsibilities of the United States Marshals Service by virtue of the contract between the Central Falls Detention Facility Corporation (CFDFC) and the United States Marshals Service. The court rejected the defendants' argument.

First, the court found that the contract did not permit Cornell to assume the duties of the United States Marshals Service. The contract required CFDFC to house federal prisoners in "accordance with state and local laws, standards, policies, procedures, or court orders applicable to the operations of the facility." *Id.* at 64. It further provided that the United States Marshals Service would be permitted to make periodic inspections of the facility to monitor its operation. *Id.* at 64–65. The court found that these provisions did not transfer investigative or arrest authority to the defendants:

> The fact that Cornell's operating procedures are subject to review by the appropriate governmental agency, here the United States Marshals Service, does not indicate that Defendants have assumed duties or responsibilities that include the power to arrest or to investigate. It does indicate that the Marshals Service enjoys a power of oversight to ensure that Cornell complies with all applicable laws and to verify that it establishes policies that meet the stan-

dards propounded in the IGA. Nevertheless, the Marshals Service has neither deputized Wyatt's employees nor accorded them the concomitant power to arrest or to investigate.

*Id.* at 65. The court further found that no federal law granted the private defendants such authority. *Id.* While the court recognized that other federal courts have found prison officials to be "investigative or law enforcement officials" under the Act, those cases dealt with institutions operated by government entities, not private corporations. The court explained:

> These cases do not provide any useful guidance in this case. Defendants in the instant matter are a private entity, and its Director. They are not federal corrections officers who might arguably be within the class of any officer of the United States ... empowered by law to conduct investigations of or to make arrests for the offenses in § 2516. There is simply no statute or case which bestows either of these powers upon Cornell or its employees. In fact, the statute that creates the United States Marshals Service, 28 U.S.C. § 561 (1994), provides that the Director of the Marshals Service has the power to appoint employees of the Marshals Service and to designate those employees as law enforcement officers. Nothing in the record indicates that the Director of the Marshals Service has, in any way, designated Wyatt's employees to be law enforcement officers with the attendant power to arrest.

*Id.* As such, the court denied the defendant's motion for summary judgment, concluding that the law enforcement exception did not shield the defendants from liability.[2] The court finds the court's reasoning

---

2. The court recognizes that the plaintiffs in *Huguenin* brought a civil complaint against defendants under the federal cause of action created in favor of any person whose oral

communication is intercepted in violation of the Act. 18 U.S.C. § 2520 (authorizing recovery of civil damages for violations of the Act). Here, in contrast, the defendants seek

in *Huguenin* to be persuasive and consistent with the plain language of § 2510(7).

The court's holding in *Huguenin* contrasts with that in *United States v. Rivera*, 292 F.Supp.2d 838 (E.D.Va.2003). In *Rivera*, the defendant argued that the law enforcement exception did not apply to calls he made while in custody at the Arlington County Detention Center because those calls were recorded by Verizon and Global Tel*link, private entities, and not an investigative or law enforcement officer. *Id.* at 842. The court disagreed, holding that an entity acting as the agent of a prison pursuant to a government contract may qualify under § 2510(7) as an investigative or law enforcement officer. In reaching this conclusion, the court reasoned that other sections of the Act provide "that an interception under this chapter may be conducted in whole or in part by Government personnel, *or by an individual operating under a contract with the Government,* acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception." *Id.* at 843(quoting 18 U.S.C. § 2518(5)). The court further noted that Title III's legislative history confirms that monitoring and interception under the statute may be performed by government personnel or "by individuals operating under contract with the Government," provided that those individuals are properly authorized and supervised. *Id.* (quoting See S. REP. NO. 99–541, at 31, 1986 U.S.Code Cong. & Admin.News, p. 3555 (1986)). Based upon this section and underlying Congressional intent, the court found that "[i]t follows that Verizon's and Global Tel*link's recording of Rivera's calls pursuant to their contract with Arlington County comes within the law enforcement exception." *Id.* at 843.

The court finds *Huguenin* more persuasive than *Rivera* for at least two reasons. First, the *Rivera* court relied on the language in § 2518(5) in support of the argument that a government contractor could fall within the law enforcement exception. This statutory provision (and the legislative history referenced in *Rivera*), however, merely contemplates that private government contractors may assist the government in the technical aspects of interception and in interpreting foreign language or coded communications once the government has secured a court order authorizing an interception. This section does not contemplate whether or not government contractors should be characterized as investigative or law enforcement officials for purposes of the law enforcement exception. Second, the *Rivera* court uses a separate statutory section (and that section's legislative history) to trump the plain meaning of § 2510(7), which defines law enforcement or investigatory officials as (1) officers of the United States, the State or a political subdivision thereof; and (2) empowered by law to conduct investigations or make arrests. This approach is inconsistent with the Tenth Circuit's method of statutory construction. *St. Charles Inv. Co. v. C.I.R.*, 232 F.3d 773, 776 (10th Cir.2000) (noting that in cases of statutory construction, the court must look first to the plain language of the law, and where the language of the statute is plain, it is improper for the court to consult legislative history in determining Congressional intent). As such, the court believes that the evidence does not demonstrate that CCA officials

to suppress communications allegedly intercepted in violation of the Act as evidence in a criminal proceeding. 18 U.S.C. § 2515 (prohibiting use as evidence of intercepted communications). This distinction, however, is immaterial. The holding in *Huguenin* is based upon a legal interpretation of the law enforcement exception. This question of law does not vary depending upon the remedy sought by an aggrieved party.

are entitled to the protections of the law enforcement exception.

## B. The Consent Exception

■ The government also contends that the recordings are admissible under the consent exception. The wiretapping provisions provide that it shall not be unlawful for a person to intercept a wire, oral, or electronic communication where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception. 18 U.S.C. §§ 2511(c) and (d). The "consent" exemption under Title III is construed broadly to encompass implied consent. *Gilday v. Dubois*, 124 F.3d 277, 296 (1st Cir.1997). Moreover, the federal statute indicates that the requisite consent under the Federal Wiretapping Act my be provided by either party in the conversation. *Id.* (citing 18 U.S.C. § 2511(2)(c)) (no impermissible "interception" where "one of the parties to the communication has given prior consent to such interception").

Here, Mr. Ford testified that as a matter of policy, CCA records all telephone calls placed by inmates at the facility. Moreover, Mr. Ford testified that inmates at CCA are informed of the potential for monitoring and recording in several different ways. First, an inmate is typically informed during orientation that his phone calls are subject to recording and or monitoring. Second, CCA's inmate handbook notifies inmates that "[t]elephone conversations may be monitored and/or recorded for security reasons." Third, CCA officials have placed a sign above the telephones informing inmates that calls are subject to monitoring. Finally, at the outset of a telephone call, the operator informs the recipient that this is a collect call and that the conversation is subject to monitoring and recording. Defendants argue that the government's evidence does not prove definitively that Mr. Hargrove received actual notice that his conversations could be recorded. During one of the recorded conversations, however, Mr. Hargrove stated "I can't hardly talk on this phone, cause you know they got it screened," and "dey [sic] got this phone tapped so I gotta be careful." These admissions demonstrate that Mr. Hargrove received actual notice of CCA's monitoring and recording policy. Moreover, this evidence is sufficient to demonstrate, as a matter of law, that Mr. Hargrove impliedly consented to the recording of his telephone conversations. *See United States v. Kalyvas*, 127 F.3d 1110, 1997 WL 651761, at *6 (10th Cir. Oct. 21, 1997) (affirming district court's finding of consent where penal institution gave all inmates notice that personal calls could be monitored and recorded); *Hammond*, 286 F.3d at 192 (finding that the defendant consented to the interception of his conversations because he was notified of recording and nonetheless used the telephone); *United States v. Amen*, 831 F.2d 373, 379 (2d Cir.1987) (finding defendants impliedly consented to monitoring when they had notice of the interception system and still decided to use the telephones); *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir.1992) (prisoner impliedly consented to recording where he had notice of policy, despite defendant's argument that he did not consent because he had no choice concerning whether he wanted to have his calls monitored); *Rivera*, 292 F.Supp.2d at 844 (noting that in the prison context, when the facility has notified an inmate that his telephone calls may be recorded and monitored, the inmate's subsequent use of the telephone implies the requisite statutory consent to the recording and monitoring).

Defendants, however, argue that Mr. Hargrove did not consent to the recording because CCA's notice to him that conversations would be subject to monitoring and recording merely establishes "acquiescence" and not consent. This proposition

has found some judicial support. *See United States v. Daniels,* 902 F.2d 1238, 1245 (7th Cir.1990) ("[K]nowledge and consent are not synonyms."); *United States v. Cheely,* 814 F.Supp. 1430, 1443 (D.Alaska 1992) ("I share the concern expressed by the Seventh Circuit in *United States v. Daniels,* that this reasoning turns acquiescence into consent."); *see also United States v. Feekes,* 879 F.2d 1562, 1565 (7th Cir.1989) (Although accepted in *United States v. Amen* on the basis of considerable case authority and some legislative history, this argument is troubling. To take a risk is not the same thing as to consent."); *Crooker v. U.S. Department of Justice,* 497 F.Supp. 500, 503 (D.Conn. 1980) ("[I]n the present case, knowledge of the monitoring ... and the existence of a justifiable need for such monitoring are clearly not sufficient to establish consent."). The court, however, finds this distinction (acquiescence versus consent) to be overly technical, and it therefore joins those courts that have found consent to exist where the prison facility has notified an inmate that his telephone calls may be recorded and monitored, and the inmate subsequently decides to use the phone. This interpretation is consistent with the Tenth Circuit's unpublished opinion in *Kalyvas.* It is also consistent with Congress' intent to construe the consent exception broadly under the Act. *See Amen,* 831 F.2d at 378 ("Congress intended the consent requirement to be construed broadly."); *Griggs–Ryan v. Smith,* 904 F.2d 112, 116 (1st Cir.1990) (citing *United States v. Willoughby,* 860 F.2d 15, 19 (2d Cir.1988)). Moreover, the interpretation has a logical appeal. Where a defendant knows on each occasion, prior to using the telephone, that his call could be recorded or monitored, he has the option not to use the phone if he

wishes to avoid such surveillance. *Rivera,* 292 F.Supp.2d at 845. "It is not unreasonable, despite defendant's contention to the contrary, for the facilities to compel [defendant] to make that choice given that as a detainee and convicted felon, [defendant] had no right to use the phone, and had only been granted a privilege to do so." *Id.* "The urged distinction between acquiescence and consent would only be persuasive if, as is not the case here, [defendant] had a right to unmonitored telephone calls." *Id.*[3] Based on the foregoing analysis, the court concludes that the recorded conversations satisfy the consent exception to the Federal Wiretapping Act and are not subject to suppression under 18 U.S.C. § 2515.

## II. Motion to Dismiss Indictment Based Upon Preindictment Delay

■ The defendants also move to dismiss the indictment based upon the delay in bringing an indictment in this case. Preindictment delay can rise to the level of a due process violation "where (1) the defendant suffered actual prejudice resulting from the delay; and (2) the delay was purposefully designed to gain tactical advantage or to harass." *United States v. Colonna,* 360 F.3d 1169, 1176–77 (10th Cir. 2004). "To constitute a showing of actual prejudice, the defendant must show that he has suffered definite and not speculative prejudice." *Id.* at 1177. "Thus, vague and conclusory allegations of prejudice resulting from the passage of time are insufficient to constitute a showing of actual prejudice for the purposes of preindictment delay." *Id.* (quotations and citations omitted).

■ Here, the defendants question the validity of the delay between the apparent

---

3. The same rationale applies to Mr. Hargrove who was a pretrial detainee awaiting trial. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (noting that pretrial detainee does not possess the full range of freedoms of an unincarcerated individual).

termination of the Federal Bureau of Investigation's ("FBI") inquiry into this case and the government's efforts to secure an indictment. The defendants contend that the FBI appears to have concluded its investigation on or about June 25, 2002. The government, however, did not secure an indictment until December, 10, 2003. Defendants suggest that this delay of approximately 18 months violated their due process rights. The court, however, finds that defendants have failed to demonstrate either actual prejudice or that the delay was purposefully designed to gain tactical advantage or to harass.

First, defendants have not demonstrated actual prejudice. In their motion, defendants admit that they "cannot identify a specific witness or a specific document that has been lost because of the delay in the prosecution of this case." Instead, defendants argue that "memories fade with the passage of time," and that "[i]t is likely that...witnesses will not be able to testify with the clarity that they could have years ago and will thus be less credible to the jury." In particular, defendants suggest that the government has gained a tactical advantage (to the prejudice of the defendants' case) because law enforcement officials were able to make contemporaneous reports that memorialized Latonia Torrence's statements to them in the spring of 2002. In contrast, defendants argue that they were not in a position to preserve the statements of their potential witnesses. This argument is flawed on several levels. First, the investigative reports summarizing Ms. Torrence's statements appear to be beneficial to the defense. According to the defendants, Ms. Torrence told three versions of the same events in three interviews with FBI agents in the spring of 2002. Thus, by recording or summarizing these interviews, the government has preserved impeachment material for the defendants. Second, while defendants suggest they

were not in a position to contemporaneously record or summarize the statements of their witnesses, they have failed to identify who would testify on their behalf and the nature and content of their testimony. As such, the defendants' claims of prejudice are reduced to vague, speculative and conclusory allegations of the potential for a witnesses' memory to fade with the passage of time. The Tenth Circuit has consistently rejected the notion that allegations of prejudice associated with the passage of time can rise to the level of a constitutional violation. *Colonna*, 360 F.3d at 1177 ("vague and conclusory allegations of prejudice resulting from the passage of time are insufficient to constitute a showing of actual prejudice for purposes of preindictment delay."); *United States v. Johnson*, 120 F.3d 1107, 1110 (10th Cir.1997) (finding general allegation that alibi defense was prejudiced by the lapse of time because the memories of potential witnesses have faded insufficient to demonstrate prejudice); *United States v. Comosona*, 848 F.2d 1110, 1114 (10th Cir.1988) (rejecting argument that defendant suffered actual prejudice as a result of the preindictment delay because his memory of the incident had dimmed by the time of trial and because witnesses who would have been able to provide exculpatory testimony had disappeared); *United States v. Ricky Carter*, No. 97–1351, 149 F.3d 1191, 1998 WL 339484, at *3 (10th Cir. June 9, 1998) (rejecting argument that difficulty in reconstructing events that may or may not have occurred during period charged in indictment and in trying to remember what he was doing during that time period demonstrated prejudice); *United States v. Primm*, No. 95–3279, 89 F.3d 851, 1996 WL 316462, at *3 (10th Cir. June 12, 1996) (allegations that passage of time created memory loss that prevented a witness from recalling details helpful to his case and kept him

from locating an additional witness who might have provided helpful testimony did not demonstrate actual prejudice).

Second, defendants have failed to demonstrate that the government delayed the indictment by approximately 18 months for the purpose of gaining a tactical advantage or to harass the defendants. Defendants simply argue that "[o]ne can reasonably infer from this [delay] that there was intentional or reckless prosecutorial delay in this case." The court disagrees. The delay here is not inordinate. Moreover, the government has set forth legitimate reasons for the delay. The government suggests that it was conducting its review of the investigative file in order to make an informed decision as to whether to pursue an indictment. Moreover, the government explains that Demetrius Hargrove has been charged with the same offenses as the defendants in this case, in addition to three counts of capital murder, in a separate indictment. The government explains that it did not want to disrupt the investigation and prosecution of Mr. Hargrove's case by prematurely securing an indictment in this case. In light of these proffered justifications, the court is persuaded that the government's delay was not attributable to any inappropriate motive. Because defendants have failed to demonstrate that they have suffered actual prejudice from the preindictment delay or that the government delayed the indictment to gain a tactical advantage or to harass the defendants, the court denies the motion to dismiss the indictment.

## III. Motion to Sever

■ Defendant Faulkner moves to sever his trial from the other co-defendants, and Defendant Rodgers has joined in that motion. In support of the motion, Mr. Faulkner contends that evidence against one defendant will likely taint the other two defendants in the eyes of the jury. In other words, defendant's motion is based on the potential "spillover" effect that evidence against one defendant could have on the other defendants.

Rule 8(b) of the Federal Rules of Criminal Procedure provides that defendants may be charged together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Mr. Faulkner does not suggest that he was improperly joined under Rule 8. Instead, he contends that severance is required under Fed.R.Crim.P. 14. Rule 14, however, permits a district court to grant a severance of defendants if "it appears that a defendant or the government is prejudiced by a joinder." Fed. R.Crim.P. 14. In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court explained:

> [A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically ad-

missible only against a codefendant also might present a risk of prejudice. *Id.* at 539, 113 S.Ct. 933. "Although a district court is more likely to determine separate trials are necessary where the risk of prejudice is high, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Rodriguez–Aguirre,* 108 F.3d 1228, 1234 (10th Cir.1997) (quoting *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933). "Rule 14 leaves the determination of risk of prejudice and any remedy for such prejudice to the sound discretion of the district court." *Id.* (citing *Zafiro,* 506 U.S. at 541, 113 S.Ct. 933).

Here, the court finds that the parties are not prejudiced by joinder of all three defendants, and severance is not required. The defendants' entire argument in support of severance is grounded upon the possibility that the government's evidence presented against one party may impermissibly spill over and taint the other defendants in the eyes of the jury. Mr. Faulkner, however, does not suggest that the government's evidence substantially targets only one defendant, subjecting the other defendants to the risk of a jury finding them guilty by association. Moreover, the Tenth Circuit has found that "[n]either a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect'... is sufficient to warrant severance." *United States v. Powell,* 982 F.2d 1422, 1432 (10th Cir.1992). While severance may occasionally be justified when "many defendants are tried together in a complex case and they have markedly different degrees of culpability," *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933, this is not such a case. There are only three defendants, and all are charged with involvement in a common scheme. Finally, any potential "spill over" can be cured with a proper limiting instruction at trial. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933 (noting trial court's use of limiting instructions will often serve to cure any risk of prejudice caused by a joint trial); *United States v. Emmons,* 24 F.3d 1210, 1219 (10th Cir. 1994) (concluding jury instruction eliminated any alleged spillover effect of disproportionate evidence presented against codefendant). In light of the foregoing, the court denies defendants' motion to sever.

### CONCLUSION

In the end, the court denies all three of the defendants motions. The court denies the motion to suppress because the communications intercepted by CCA officials fall within the consent exception to the Federal Wiretapping Act. The court denies the motion to dismiss the indictment on grounds of preindictment delay because defendants were not actually prejudiced by the delay and the government did not act in bad faith. The court denies the motion to sever because defendants are not prejudiced by the joinder of all parties.

**IT IS THEREFORE ORDERED** that defendants' motion to suppress (Doc. 72), motion to dismiss the indictment (Doc. 73), and motion to sever (Doc. 74) are denied.