**The UNITED STATES of America**

v.

**Paul KACZOWSKI (Counts 1, 2 & 3)**
**Bruce Ziminski (Counts 1, 2 & 3)**
**Frank Masterana (Counts 1—5)**

**No. 98–CR–47E.**

United States District Court,
W.D. New York.

Sept. 22, 1999.

Denise E. O'Donnell, United States Attorney, Anthony M. Bruce, Assistant United States Attorney, of Counsel, Buffalo, NY, for Government.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Herbert L. Greenman, of Counsel, Buffalo, NY, for Defendant Kaczowski.

Dennis C. Gaughan, Hamburg, NY, for Defendant Masterana.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

Paul Kaczowski, a defendant herein, has objected to the Report and Recommendation of the United States Magistrate Judge Leslie G. Foschio as filed August 24, 1999 in this case.

Mr. Kaczowski, along with two other gentlemen, was indicted April 24, 1998 for having (COUNT ONE) conspired to violate 18 U.S.C. § 1955 by doing certain acts as part of an illegal gambling business—a bookmaking operation which accepted wagers on sporting events—and (COUNT TWO) conducted etc. such bookmaking operation and (COUNTS THREE, FOUR and FIVE) used interstate and international telephone facilities to carry on such bookmaking operation. Fifty-two overt acts are set forth in support of the charges in COUNT ONE. They concern meetings and telephone conversations in which one or more of the three defendants met or conversed by telephone with an unindicted individual—usually one Joseph Zambito—and, usually, provided "line information" to and, at times, accepted wagers from Zambito or another person. COUNT TWO charges that the three defendants and others "conducted, financed, managed, supervised, directed and owned" an unlawful sports bookmaking operation. COUNT THREE charges that the three defendants and others utilized interstate and international telephone facilities in February and March of 1996 to promote and carry on the sports bookmaking operation. COUNTS FOUR and FIVE charge Masterana with such utilization on February 24, 1996 and March 8, 1996, respectively.

Masterana and Kaczowski moved to dismiss the Indictment or to suppress testimony and other evidence garnered from interceptions of telephone conversations. They assert that that which is set forth in the Indictment does not charge a federal offense, in large part because the sports bookmaking operation and actions in essential support thereof were not illegal in that foreign country in which it and they were carried out.

The undersigned has devoted much thought and attention to whether that which is set forth in this Indictment sets forth federal criminology and, more importantly, how the trial jury is going to be able to distinguish between what may merely facially be criminal and what actually is a violation of Federal and State laws. Very possibly, activities here—including the use of interstate and foreign communication facilities—were not actually violative of the Federal laws set forth in the Indictment but facially they were. The jury and the undersigned are going to have be on their respective toes in determining whether and when activities occurring here were in themselves criminal—peering into and through the evidentiary morass to determine whether certain acts, facially criminal in their nature, actually occurred here as opposed to at that offshore facility where and from which the gambling mainly occurred—or occurred *in toto*. If the main or major gambling operation was at the offshore site—as it well appears to have been—did any significant part or phase thereof occur here and, if it did, was such part or phase violatory of the pertinent laws of New York State and of the United States of America? There can be no answer to such now and the charges against the defendants will stand. On trial there must be a point-by-point—even a minipoint-by-minipoint—analysis of and ruling upon what the prosecutor will be seeking to place before the trial jury for its consideration.

Meanwhile, defendant Kaczowski's Objections to the Report and Recommendation of Magistrate Judge Foschio are overruled and the prosecution shall proceed.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned on May 1, 1998 by the Hon. John T. Elfvin for Report and Recommendation on all dispositive motions. It is currently before the court on Defendant Masterana's motion to dismiss the indictment, filed January 14, 1999 (Docket Item No. 11), and Defendant Kaczowski's motions to dismiss the indictment and to suppress testimony from witnesses and evidence derived from interception of telephone conversations, filed February 5, 1999 (Docket Item No. 14), and to suppress tape recorded conversations, filed June 17, 1999 (Docket Item No. 21).

### *BACKGROUND and FACTS*

Defendants were indicted, along with Bruce Ziminski,[1] in a five count indictment on April 24, 1998 charging violations of 18 U.S.C. §§ 2(a) and (b), 371, 1084, 1952 and 1955. Specifically, Defendants are charged with aiding and abetting and conspiring to conduct, finance and own an illegal gambling business which used facilities in interstate and foreign commerce to distribute the proceeds of unlawful bookmaking and using interstate and foreign wire communication facilities between this district and the West Indies and Central America to place bets on sporting events. Defendants allegedly had telephone conversations and met with others at local restaurants where they agreed to actions on which the substantive allegations are based and also shared gambling line information and accepted wagers in connection with the sports bookmaking enterprise.

1. Ziminski has entered a plea and has not filed any motions.

In connection with the Government's investigation of the bookmaking operation, two electronic surveillance intercept orders were obtained on January 27, 1996 and February 28, 1996 for telephone lines maintained at an office located at Suite 111, 1325 Millersport Highway, in Williamsville, New York ("Suite 111"). Based on these orders, the Government intercepted telephone conversations in which gambling line information was provided and wagers were accepted.

As a result of his conviction on an unrelated matter, Defendant Kaczowski entered the McKean Federal Correctional Institute in McKean, Pennsylvania ("McKean Correctional Facility") in March, 1996. On March 23, 1996, the Government intercepted two telephone calls placed by Kaczowski to others outside McKean Correctional Facility from telephones located within the facility's dormitories. Posted next to each such telephone was either a red or black sign stating:

NOTICE

THE BUREAU OF PRISONS RESERVES THE AUTHORITY TO MONITOR CONVERSATIONS ON THIS TELEPHONE.
YOUR USE OF INSTITUTIONAL TELEPHONES CONSTITUTES CONSENT TO THE MONITORING. A PROPERLY PLACED TELEPHONE CALL TO AN ATTORNEY IS NOT MONITORED.

Upon entering custody at the McKean Correctional Facility, Kaczowski executed an "Acknowledgment of Inmate" form, Section 3 of which advises inmates of the prison's telephone monitoring program and that use of the telephone's constitutes consent to the surveillance. It is undisputed that several conversations of Defendant Kaczowski held over those telephones were intercepted and tape recorded by the facility.

Defendants have filed omnibus motions seeking, *inter alia,* dismissal of their respective charges on the grounds of facial insufficiency and double jeopardy, suppression of testimony, to suppress wiretap evidence and to suppress tapes of recorded telephone conversations made by Defendant Kaczowski while incarcerated at McKean Correctional Facility. Along with his challenge to the Title III electronic intercept orders, Defendant Kaczowski also requests a hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Government responded on March 1, 1999.

Oral argument was conducted on April 22, 1999. A supplemental brief was filed by Defendant Masterana on May 28, 1999. On June 17, 1999, Defendant Kaczowski filed a motion to dismiss the content of tape recorded conversations obtained while Kaczowski was incarcerated in a federal prison and further supplemented his earlier brief in accordance with the oral argument. The Government filed a response to that motion on July 22, 1999.

### DISCUSSION

#### 1. *Dismissal of the Indictment*

Defendants move to dismiss the Indictment as insufficient to charge an offense. Defendants claim that the Indictment fails to fairly apprise them of the conduct giving rise to the charged offenses, as required by Rule 7(c)(1) of the Federal Rules of Criminal Procedure and, as such, the Indictment does not meet constitutional notice requirements under the Sixth Amendment as to the essential facts of the offenses charged.[2]

Specifically, Defendant Kaczowski maintains that as the Indictment charges Defendants with committing acts outside the United States in a country in which gambling is legal, as such, the Indictment is insufficient to allege a crime. Affidavit of Herbert L. Greenman, Esq., in Support of

**2.** "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation ...." U.S. Const. Amend. VI.

Defendant Kaczowski's Omnibus Motion filed February 5, 1999 (Docket Item No. 14) ("Greenman Affidavit") at ¶ 22. Defendant Masterana argues that the Government has conceded that the placing of a bet is legal in New York and, thus, such actions provide no basis for the crimes charged. Defendant Masterana's Brief filed May 28, 1999 (Docket Item No. 19) ("Masterana Brief") at 1.

An indictment is facially valid and sufficient if it contains the elements of the offense charged, fairly informs a defendant of the charges against which he must defend, and enables a defendant to plead an acquittal or a conviction in bar of further prosecution for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992); *United States v. Ferrara,* 701 F.Supp. 39 (E.D.N.Y.1988). An indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state the time and place of the alleged offense in approximate terms. *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Covino,* 837 F.2d 65, 69 (2d Cir.1988); *United States v. Bagaric,* 706 F.2d 42, 61 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *Ferrara, supra,* at 44.

The form of an indictment is governed by Fed.R.Crim.P. 7(c)(1) which provides that "the indictment . . . shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Macklin,* 927 F.2d 1272, 1276 (2d Cir.), *cert. denied,* 502 U.S. 847, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991). To satisfy this rule, "[t]he facts alleged must be adequate to permit a defendant to plead former jeopardy upon prosecution. The indictment must also be sufficiently specific to enable the defendant to prepare a defense."

*United States v. Carrier,* 672 F.2d 300, 303 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). As such, it is well settled that indictments which track the statutory language defining an offense are, as a general rule, sufficient under Rule 7(c) so long as application to a particular defendant is clear. *United States v. Upton,* 856 F.Supp. 727, 739 (E.D.N.Y.1994). Additionally, while a bill of particulars cannot cure a constitutionally defective indictment, particularization is appropriate when the indictment is challenged as insufficient to permit the preparation of an adequate defense. *Upton, supra,* at 740–41. It is well established that an indictment which complies with Rule 7(c) also satisfies the requirements of the Sixth Amendment. *Russell, supra,* at 763–64, 82 S.Ct. 1038; *Upton, supra,* at 738; *United States v. Abrams,* 539 F.Supp. 378, 384 (S.D.N.Y.1982).

Specifically, an indictment will satisfy the Sixth Amendment if it "contains the elements of the offense intended to be charged, 'and *sufficiently* apprises the defendant of what he must be prepared to meet.'" *Russell, supra,* at 763–64, 82 S.Ct. 1038 (quoting *Hagner v. United States,* 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932) (citations omitted)) (emphasis added). While pleading "generic" terms only without the "species" will be insufficient, *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875), an indictment need only apprise the defendant of the nature of the accusation against him "with *reasonable* certainty," and will be sufficient if the language of the statute is charged along with "a statement of the facts and circumstances as will inform the accused of the specific offense . . . with which he is charged." *Russell, supra,* at 765–66, 82 S.Ct. 1038 (citing cases) (emphasis added).

Defendants claim that none of the federal statutes apply to operation of a gambling enterprise where the bets are accepted in a foreign country, Greenman

Affidavit at 11–13; Masterana Brief at 5, however, nothing in the record or law supports this contention. The charged offenses under 18 U.S.C. §§ 1084, 1952 and 1955 are an attempt by Congress to assist state and local law enforcement agencies in preventing the circumvention of state gambling prohibition laws through use of interstate communication facilities. *People v. World Interactive Gaming Corporation,* 1999 WL 591995, *7 (N.Y.Sup. July 22, 1999).

■ Under New York law, a person is guilty of promoting gambling when he knowingly advances or profits from unlawful activity, N.Y. Penal Law § 225.05 (McKinney 1989)[3] (promoting gambling in the second degree), engages in bookmaking by receiving or accepting in any one day more than five bets totaling more than five thousand dollars, N.Y. Penal Law § 225.10 (promoting gambling in the first degree), or is in possession of any writing, paper, instrument or article similar to those commonly used in the operation or promotion of a bookmaking scheme or enterprise, N.Y. Penal Law §§ 225.15 and 225.20 (possession of gambling records). A person " 'profits from gambling activity' when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity." N.Y Penal Law § 225.00(5). "Bookmaking" is defined as "advancing gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcomes of future contingent events." N.Y. Penal Law § 225.00(9). "Advancing gambling activity" occurs under New York law when,

acting other than as a player, a person "engages in conduct which materially aids any form of gambling activity." N.Y. Penal Law § 225.00(4).

■ Defendants maintain they were engaged in merely *placing* bets which they further maintain the Government has conceded is legal in New York. Affidavit of Herbert L. Greenman, Esq., attached to Notice of Motion filed June 17, 1999 (Docket Item No. 21) ("Greenman Affidavit in Support of Motion to Suppress"), ¶¶ 2–5. However, regardless of whether placing bets, *simpliciter,* is legal in New York, a plain reading of the Indictment indicates Defendants are accused of more than solely placing bets.

In particular, the Indictment sets forth allegations which, if proven, establish Defendants maintained facilities where they regularly engaged in the promotion of gambling by receiving and relaying bets from gamblers, *i.e.,* "players," to an offshore gambling enterprise. For example, the Indictment alleges Defendants and others working for them, used telephones to provide gambling line information, *i.e.,* "odds" or "point spread,"[4] and accepted wagers from individual gamblers. See Overt Acts 10, 20–39 and 41–51. Defendant Kaczowski allegedly possessed papers used in collecting from and paying bettors. Overt Act 19 and 52. As stated, under New York law, the crime of Promoting Gambling in the First Degree occurs when a person engages in bookmaking by either *receiving* or accepting wagers.[5] Thus, even if the evidence were to show the bets at issue were not technically accepted until communicated to the off-shore destination, the Indictment nevertheless charges Defendants with unlawful bookmaking. Regardless of whether the evidence shows

---

**3.** Unless otherwise indicated, all references to N.Y. Penal Law are to McKinney 1989.

**4.** *See United States v. Scavo,* 593 F.2d 837, 840 (8th Cir.1979); *United States v. Todaro,* 550 F.2d 1300, 1302 n. 4 (2d Cir.), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2975, 53 L.Ed.2d 1093 (1977).

**5.** Should Defendants choose to defend on the basis that they qualify as "players" within the meaning of Penal Law § 225.00(5), the trial court will determine whether such qualifies as a defense and, if so, instruct the jury accordingly.

Defendants received bets or accepted bets to be "laid off" elsewhere, in either case, the conduct would constitute illegal bookmaking. Accordingly, the Indictment sufficiently charges Defendants with actions which, if proven, would constitute promoting gambling through maintenance of an illegal bookmaking operation assisted with the use of telephones, in violation of New York law. As such, the court considers whether the Indictment otherwise sufficiently alleges violations of federal law.

■ Counts I and II charge Defendants both with conspiring to violate and with violating 18 U.S.C. § 1955, the Wagering Paraphernalia Act, which renders the promotion of gambling, in a state in which it is illegal, a federal crime. Section 1955 defines an "illegal gambling business as a gambling business which

(i) is a violation of the law of State of political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."

18 U.S.C. § 1955(b)(1).

Further, "gambling" is defined thereunder to include bookmaking. 18 U.S.C. § 1955(b)(2).

In the instant case, the overt acts specified in support of the Indictment include allegations that Defendant Masterana accepted wagers (Overt Acts 10 and 20) and worked with unidentified persons who accepted wagers. (Overt Acts 21—23, 25–30, 32, 33, 35, 37–38, 40, 42–44, and 46–51). A total of five persons are alleged to have worked together in the bookmaking operation, including Defendants Masterana, Kaczowski, Ziminski, and an unidentified male and female who allegedly worked for Masterana. Further, the 52 overt acts in furtherance of the alleged bookmaking op-

eration covered a period in excess of thirty days. Accordingly, Counts I and II of the Indictment sufficiently charge conspiracy to violate and violations of 18 U.S.C. § 1955(b)(2).

■ Defendant Masterana further urges dismissal of the Indictment insofar as it alleged a violation of 18 U.S.C. § 1955 on the basis that gambling activity is alleged to have occurred over only 14 days of a 60 day period which is insufficient to support a finding that the alleged gambling operation was in "substantially continuous operation for a period in excess of thirty days" as required under 18 U.S.C. § 1955(b)(1)(iii). Masterana Brief at 2. Further, Masterana contends that only four known conspirators, instead of the requisite five, have been identified through disclosure. *Id.*

Masterana's argument that an indictment alleging gambling activity occurred on only 14 out of a total of 60 days, less than 25% of the total period alleged in the Indictment, is insufficient under 18 U.S.C. § 1955(b)(1)(iii) to charge involvement in a "substantially continuous operation for a period in excess of thirty days," is without merit for several reasons. First, 52 overt acts in furtherance of the charged bookmaking operation are said to have occurred on 14 days between February 2, 1996 and March 14, 1996, a total of 42 days, thus constituting a period "in excess of" 30 days. Moreover, the alleged occurrence of 52 overt acts over a 42 day period averages out to more than one overt act a day for that period, a level of activity more than adequate to support a charge of "continuous operation." Second, Masterana's argument ignores the fact that Defendants are also alleged to have generated gross revenue in excess of $2,000 from the charged bookmaking enterprise, an alternative basis upon which to find liability under § 1955(b)(1)(iii). *See* Indictment at 2. Accordingly, dismissal of the Indictment on this ground should be DENIED.

Masterana contends that as only four known conspirators have been identified by the Government the Indictment is insufficient to charge an involvement in an illegal gambling business which "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business," 18 U.S.C. § 1955(b)(1)(ii). However, the court finds that the Indictment alleges at least five persons were involved in the charged bookmaking business. In particular, besides Masterana, Kaczowski and Ziminski, the named Defendants in the Indictment, Overt Acts 21–25, 27, 29, 33, 35, 45 and 50 refer to line information being provided and wagers being accepted by an unknown female known to be working for Masterana. Additionally, Overt Acts 26, 28, 30, 31, 32, 34, 36–40, 42, 43, 44, 46–49 and 51 refer to line information being provided and wagers being accepted by an unknown male known to be working for Masterana. Accordingly, the Indictment charges a total of five people in the illegal bookmaking business and dismissal of the Indictment on this ground should be DENIED.

■ Indictment Counts I and III allege Defendants conspired to and violated the Travel Act, 18 U.S.C. § 1952, which prohibits the use of "any facility in interstate or foreign commerce" with intent to promote any unlawful activity, defined as including a "business enterprise involving gambling . . . in violation of the laws of the State in which [the alleged illegal acts] are committed or of the United States." 18 U.S.C. § 1952(a) and (b). Here, the Indictment charges Defendants with conduct which, if proven, would establish that they engaged in bookmaking within New York, through the use of interstate and foreign communication facilities, i.e., telephone lines, over which gambling line information was disbursed and wagers were received and transmitted to the West Indies where they were accepted, as well as through meetings at establishments within interstate commerce. Specifically, the Indictment alleges that Defendants, or others

working for them, had telephone conversations during which gambling line information was relayed and wagers accepted. Indictment at 3–12. Counts I and III thus sufficiently charge conspiracy to violate and violations of 18 U.S.C. § 1952.

■ Counts I and IV charge Defendants with conspiracy to violate and violations of the Wire Act, 18 U.S.C. § 1084 which prohibits "use of a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" unless the transmission of such information occurs between one state or foreign country and another state or foreign country in which such betting is legal. 18 U.S.C. § 1084(a) and (b). Defendants argue that the bets and wages were accepted offshore in a country in which gambling is legal and, as such, dismissal of Counts I and IV of the Indictment is warranted.

Defendants' argument, however, proceeds on an incorrect interpretation of 18 U.S.C. § 1804, a plain reading of which demonstrates the criminality of the placing of bets or wagers on any sporting event or contest, through interstate and foreign communication, is a violation if such conduct is illegal in either the state or country in which the bet is placed or the wager is accepted. In other words, to escape prosecution under § 1084, the betting activity at issue must be legal in *both* jurisdictions. *United States v. McDonough*, 835 F.2d 1103, 1104 (5th Cir.1988) (holding federal ban on interstate wire transmission of bets on sporting events from Texas where such gambling was illegal to another state violated 18 U.S.C. § 1084 regardless of whether gambling was legal in the other state, citing *Martin v. United States*, 389 F.2d 895 (5th Cir.1968), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1808, 20 L.Ed.2d 656 (1968)); *World Interactive Gaming Corp.*, *supra*, at *5 (holding gambling conducted over the internet with bets placed in New York, where gambling is illegal, and re-

ceived in Antigua, where gambling is legal, violates 18 U.S.C. § 1084). Here, bookmaking, the predicate state offense, is illegal in New York. Accordingly, dismissal on this ground should be DENIED.

*United States v. Truesdale,* 152 F.3d 443 (5th Cir.1998), on which Defendants rely as holding that the transmission of a bet to a foreign country where gambling is permitted renders the bet legal regardless of whether gambling is legal in the state of the bet's origination, is readily distinguishable. In *Truesdale,* the court reversed a denial of post-verdict judgment of acquittal on the ground that there was insufficient evidence to support the predicate state offense necessary to uphold the guilty verdict under 18 U.S.C. § 1955. Despite the existence of evidence supporting other predicate state gambling offenses, as no other such offense was alleged in the indictment, the case was not tried nor was the jury instructed on another uncharged theory and, thus, the court refused to affirm. Also, *Truesdale* was an appeal following a trial and verdict which have not occurred in the instant case. Moreover, whether the Wagering Paraphernalia Act was violated by the placing of bets from a state in which gambling was legal to a off-shore gambling enterprise located where gambling was legal was not an issue before the court.

Further, New York Supreme Court recently held that, under New York law, if a gambler physically is located in New York when the bet is placed, then New York is the location where the gambling occurred. *World Interactive Gaming Corporation, supra,* at *5. At issue in that case was whether bets placed over the internet by gamblers (players) who were physically within New York to a gambling enterprise located in Antigua where gambling is legal constituted gambling as defined under New York Penal Law Article 225. The court, citing New York Penal Law § 225.00(2), held the act of placing the bet and transmitting the betting information from New York, even to an off-shore gam-

bling facility located in a foreign jurisdiction where gambling is legal, constitutes gambling activity within New York state. Specifically, the court stated, "[i]t is irrelevant that gambling is legal in Antigua. The act of entering the bet and transmitting the information from New York ... is adequate to constitute gambling activity within the New York state." *World Interactive Gaming, supra,* at *5. Thus, even if, as Defendants posit, Greenman Affidavit at 11–13; Masterana Brief at 5, acceptance of bets and providing "line" information is legal in the Dominican Republic, where it is alleged Defendants directed their customers' bets to be accepted, the Indictment nevertheless states an offense. *World Interactive Gaming Corp., supra,* at *5 (finding gambling conducted over the internet from a state where gambling is illegal to a foreign country where gambling is legal "indistinguishable" from any other form gambling as the transmission of information into a foreign country is subject to both the Wire Act and Travel Act). As the Indictment properly charges Defendants with illegal bookmaking in the state from which the foreign telephone calls emanated, *Truesdale* is inapplicable on its facts.

▇▇▇▇ Nor will Defendants be exposed to double jeopardy in violation of the Fifth Amendment by being charged with both aiding and betting as well as conspiring to commit the substantive offenses. " 'Conspiracy to commit a substantive offense and aiding and abetting the commission of the same offense constitute separate and distinct crimes.' " *Virella v. United States,* 750 F.Supp. 111, 116 (S.D.N.Y.) (quoting *United States v. Tropiano,* 418 F.2d 1069, 1083 (2d Cir.1969)), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970) (citing *Nye & Nissen v. United States,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949)). Double jeopardy thus poses no bar to a conviction of both conspiracy and aiding and abetting the substantive count so long as proof of different elements is required. *Id.* While a

conspiracy under 18 U.S.C. § 371 requires proof of an unlawful agreement between two or more persons to commit an offence against the United States, *United States v. Rubin*, 844 F.2d 979, 983–84 (2d Cir.1988) (citing *United States v. Wardy*, 777 F.2d 101, 107 (2d Cir.1985), *cert. denied*, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986)), conviction for aiding and abetting an illegal gambling operation does not. Rather, the terms "aiding" and "abetting" charge a defendant as " 'a principal when he consciously shares in a criminal act regardless of the existence of a conspiracy.' " *Virella, supra*, at 116–17 (quoting *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954). As conspiracy represents a separate crime, conviction based on aiding and abetting the substantive offenses as an object of this conspiracy is not constitutionally barred. *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir.1994) ("Conspiracy is a crime that is separate and distinct from the substantive offense that is the object of the conspiracy."), *cert. denied*, 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994). Accordingly, Defendants' claim that, if convicted as charged, they will be subjected to double jeopardy is without merit.

■ Nor is there any merit to Defendant Masterana's contention, Masterana Brief at 3, ¶¶ E and F, that without a more detailed allegation as to precisely on which gambling offense under New York Penal Law Art. 225 the Indictment is based, Defendants are exposed to double jeopardy as conviction is sought only under federal law. Regardless of what particular gambling related conduct, proscribed by New York law, Defendants may be determined to have committed, they are at risk of being convicted of conspiring and violating only 18 U.S.C. §§ 1084, 1952 and 1955. For example, should Defendant Masterana ultimately be convicted under both 18 U.S.C. §§ 1952 and 1955, even if the relevant predicate New York offense for each conviction is determined to be bookmaking, Masterana will not stand convicted of two counts of bookmaking under New York law but, rather, only three separate federal offenses—conspiracy and violation of the Wire Act and Travel Act. Conviction for violating 18 U.S.C. § 1084 does not depend on commission of a predicate state offense. Defendants thus do not face double jeopardy under the Indictment even absent further particularization.[6]

The court finds that under relevant New York law, the conduct with which Defendant are charged violates New York's laws against gambling. As such, Defendants' motion to dismiss the Indictment as insufficient to charge an offense should be DENIED.

### 2. *Suppression of Witness Testimony*

■ Defendant Kaczowski also seeks to suppress the testimony of any witness who was offered something of value, including promises of leniency or reduced sentencing, in exchange for the testimony on the basis that such testimony would be in violation of 18 U.S.C. § 201. Kaczowski Memorandum, ¶ 11. The Government maintains that such motion is a request based on *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998) ("*Singleton I* ") which has since been vacated, not followed by other jurisdictions and, as such, is without merit. Government's Memorandum at 12.

*Singleton I* is no longer the law in the Tenth Circuit, having since been vacated and rejected by the Tenth Circuit sitting

---

**6.** Reprosecution on the same conduct, following a federal conviction, by a state is, of course, not constitutionally barred. *Heath v. Alabama*, 474 U.S. 82, 89, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (holding subsequent prosecution in federal court on substantially similar charges based on the same conduct for which defendant was prosecuted in state court is not barred by the double jeopardy clause of the Fifth Amendment because the defendant has offended against the law of both sovereigns). Whether Defendants could invoke New York's statutory bar to such reprosecution, N.Y.Crim. Proc. L. § 40.20 (McKinney 1992), need not be addressed.

*en banc. United States v. Singleton,* 165 F.3d 1297 (10th Cir.), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999) (*"Singleton · II "*). Although the Second Circuit has yet to consider this issue in a published opinion,[7] every circuit that has considered a contention based on *Singleton I,* as advanced by Kaczowski, has rejected it. *See, e.g., United States v. Condon,* 170 F.3d 687, 688–89 (7th Cir. 1999); *United States v. Johnson,* 169 F.3d 1092, 1097–98 (8th Cir.1999); *United States v. Lowery,* 166 F.3d 1119, 1123—24 (11th Cir.1999); *United States v. Ramsey,* 165 F.3d 980, 987–91 (D.C.Cir.1999); *United States v. Haese,* 162 F.3d 359, 366–68 (5th Cir.1998); *United States v. Ware,* 161 F.3d 414, 418–25 (6th Cir.1998), *cert. denied,* 526 U.S. 1045, 119 S.Ct. 1348, 143 L.Ed.2d 511 (1999). Further, to date, no district court within this circuit has agreed with *Singleton I. See, e.g., United States v. Jennings* 1998 WL 865617, *6 (N.D.N.Y. Dec. 8, 1998); *Cancel–Hernandez v. United States,* 1998 WL 846824 (E.D.N.Y. Oct. 5, 1998); *United States v. Szur,* 1998 WL · 661484 (S.D.N.Y. Sept.24, 1998); *United States v. Nieves,* 1998 WL 740835 (D.Conn. Oct. 13, 1998).

Accordingly, Kaczowski's motion to suppress all testimony from any witness who may have been offered anything of value, including a promise of leniency or reduced sentence, should be DENIED.

**3.** ***Suppression of Evidence Obtained Through Electronic Intercept Order***

Defendant Kaczowski challenges the electronic surveillance orders issued pursuant to 18 U.S.C. § 2518 by Judge Arcara on January 27, 1996 and by Judge William M. Skretny on February 28, 1996 ("the Intercept Orders"). Greenman Affidavit at 13. Both orders authorize the interception of conversations over six telephone

lines originating from the office located at Suite 111. *Id.* at 14.

**a.** ***Standing***

As a threshold matter, the Government argues that no conversation intercepted pursuant to the February 28, 1996 Intercept Order involved Defendant Kaczowski. Government's Response at 15. The Government thus maintains that Kaczowski lacks standing to challenge that intercept order. *Id.*

■ To have standing to challenge an intercept order, a person must be an "aggrieved person" as defined under 18 U.S.C. § 2518(10)(a). Specifically, an aggrieved person is defined as "a person who was a party to any intercepted wire, oral, or electronic communication *or a person against whom the interception was directed."* 18 U.S.C. § 2518(10)(a) (emphasis added). *Compare United States v. Fury,* 554 F.2d 522, 525–26 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) ("a person who was not named in the wiretap order and was not a party to any conversation intercepted during that tap is not an "aggrieved person" and may not move to suppress information derived from it.").

■ As relevant, the February 28, 1996 Intercept Order states

a. there is probable cause to believe that LOUIS A. BERRAFATO (BERRAFATO), PAUL B. SCHINTZIUS (PAUL SCHINTZIUS), ROBERT A. SCHINTZIUS (ROBERT SCHINTZIUS), JOSEPH A. ZAMBITO (JOSEPH ZAMBITO), KEVIN E. LAKE (LAKE), KENNETH G. "SKIPPY" FRANZ (FRANZ), EUGENE ANTHONY NOLAN (NOLAN), "OTIS," NICHOLAS M. BOLOGNESE (BOLOGNESE),

---

**7.** The court notes the Second Circuit has recognized the overruling of *Singleton I, supra,* 144 F.3d 1343 in non-published opinions. *See United States v. Rodriguez,* 1999 WL 459762, *2 (2d Cir. June 22, 1999) (Table) and *United States v. Hall,* 181 F.3d 83 (2d Cir.1999) (Table); and, in other non-published opinions, its abrogation. *See United States v. Guadagna,* 181 F.3d 83, 1999 WL 314161 (2d Cir. May 17, 1999) (Table); and *United States v. Otusheso,* 181 F.3d 83, 1999 WL 316801 (2d Cir. May 13, 1999) (Table).

PAUL "PK" KACZOWSKI, and others as yet unknown (hereinafter "the gambling violators") have committed, are committing, and will continue to commit violations of Sections 1084 and 371 of Title 18, United States Code, knowingly using communications facilities for the intercept transmission of wagering information and conspiring to do so;

. . . . .

c. there is probable cause to believe that particular wire communications of BERRAFATO, PAUL SCHINTZIUS, ROBERT SCHINTZIUS, JOSEPH ZAMBITO, LAKE, FRANZ, "OTIS," BOLOGNESE, KACZOWSKI, and other yet unknown (hereinafter "the Millersport phone interceptees"), to and from telephones bearing the numbers (716) 631–1140, (716) 631–1141, (716) 631–1142, (716) 631–1143, (716) 631–1148, (716) 631–1149, (716) 565–9551, and (176) 565–9552, all of which are subscribed to by LOUIS A. BERRAFATO, INSIDE LINES, INC., 1325 Millersport Highway, Suite 111, Williamsville, New York (hereinafter "the Millersport phones") . . . .

February 28, 1996 Intercept Order, ¶¶ a and b.

Defendant Kaczowski is thus specifically named in the February 28, 1996 Intercept Order. Accordingly, Kaczowski has standing to challenge that Intercept Order.[8]

### b. *Normal Investigative Techniques*

█ Defendant Kaczowski challenges both Intercept Orders, contending there was no demonstration of the necessity of the Intercept Order on the basis that other investigative procedures were unlikely to succeed. Greenman Affidavit, ¶¶ 30–31, 47–49.

█ Pursuant to 18 U.S.C. § 2518(3)(c), an application for an electronic intercept order must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." The purpose of this requirement is not to render electronic surveillance an investigative tool of last resort, but to apprise the judicial officer of the progress of the investigation and the difficulties inherent in the use of normal investigative techniques. *United States v. Torres*, 901 F.2d 205, 231 (2d Cir.1990). The requirement must be construed in a practical, common sense and realistic fashion. *United States v. Ivic*, 700 F.2d 51, 57 (2d Cir.1983); *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). The statute does not require that all possible techniques be tried before a wiretap may be authorized but, rather, "[a]n affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every possible means of the investigation has not been exhausted." *United States v. Terry*, 702 F.2d 299, 310 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Here, the record demonstrates the necessity of both Intercept Orders as the information sought was not likely to be obtained through normal investigative techniques.

In the Intercept Affidavit provided in support of the January 27, 1996 Intercept Order, Special Agent Daphne Hern of the Federal Bureau of Investigation ("FBI"), explained that physical surveillance alone is generally insufficient to gather suffi-

---

**8.** The Government does not maintain that Kaczowski lacks standing to challenge the January 27, 1996 Intercept Order. Further, in her affidavit submitted in support of the application for the February 28, 1996 Intercept Order, Agent Hern states that Kaczowski was a party to conversation intercepted in accordance with the January 27, 1996 order and, as such, Kaczowski has standing to challenge the legality of that order. Affidavit of Agent Hern Submitted in Support of February 28, 1996 Intercept Order, Exhibit B to Greenman Affidavit, ¶¶ 22(a)(b) and (c). The Government does not argue otherwise.

cient evidence to support a conviction for the criminal activities at issue here. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 54.[9] According to Hern, the subjects of the requested Intercept Order "are typically cautious and alert for law enforcement activity" and "closely monitor their activities in an effort to disclose the presence of law enforcement officials who might be observing them," making it "extremely difficult for law enforcement agencies to conduct surveillance." Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 55. Analysis of pen registers had revealed that the named interceptees maintained contact with each other, but did not provide direct evidence of the suspected criminal activities. *Id.*, ¶ 56. Although the December 23, 1995 execution of a search warrant at Suite 111 revealed extensive gambling records were maintained at that location, that search did not provide evidence of the full scope of the criminal activity or the various methods used by Defendants to conduct such activity. *Id.*, ¶ 57. Future search warrants were expected to provide little evidence as to other locations or individuals involved in the criminal activity under investigation. *Id.* According to Hern, although normal investigative techniques may eventually yield sufficient information to prosecute individuals involved in the criminal activity in this district, such evidence would be insufficient to successfully prosecute those involved in Las Vegas, Nevada. *Id.*, ¶ 58. Further, Agent Hern averred it was anticipated that the "close-knit" nature of the group under investigation rendered the development of confidential sources unlikely and could pose a danger to undercover agents. *Id.*, ¶ 59.

Defendant Kaczowski also argues that Hern admitted in her affidavit in support of the January 27, 1996 Intercept Order that the identity of most of the main sub-jects in the alleged Buffalo gambling operation and, as such, sought the Intercept Order to determine if there was a connection between the Buffalo operation and a similar operation in Las Vegas, Nevada that was the subject of an unrelated investigation. Greenman Affidavit, ¶ 32. Essentially, Kaczowski's assertion is that the Intercept Order was requested not as it was the only way to identify unknown participants in a conspiracy but, rather, to "ensnare" individuals located outside the Western District of New York. Greenman Affidavit, ¶¶ 33–37.

A plain reading of Hern's affidavit in support of the January 27, 1996 Intercept Order indicates that an investigation which commenced in September 1995 of one Eugene Nolan revealed Nolan's actions as a bookmaker with a group in Las Vegas, Nevada. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 8. Nolan had previously been the subject of a federal investigation in the Middle and Western Districts of Louisiana which involved the interception of wire communications pursuant to electronic intercept orders issued between May 23, 1990 and December 13, 1983. *Id.*, ¶ 7(a)-(c). Nolan had established a network of bookmakers throughout the United States, including the Western District of New York, in connection with an entity run by a group of professional gamblers known as the "Computer Group" and maintained six telephone lines at his Las Vegas residence. *Id.* According to Hern, Berrafato is part of Nolan's bookmaking network and the Government's investigation has established that Berrafato had used Suite 111, 1325 Millersport Highway as his "bookmaking" office. *Id.*, ¶ 9. Hern also provided information obtained by a confidential source, "LV# 1", that an individual known as "THE SWAMP," but whose real name is Eugene, moved from New Orleans to Las

---

9. Copies of the affidavits provided by Agent Hern in support of the intercept order applications are attached as Exhibits A (January 27, 1996 Intercept Order) and B (February 28, 1996 Intercept Order) to Defendant Kaczowski's Omnibus Motion filed February 5, 1999 (Docket Item No. 14).

Vegas following his conviction for operating a major sport betting operation. *Id.,* ¶ 15. Eugene, whose last name was unknown, was described as a white male, approximately sixty-five years old, and who worked for a Las Vegas entity known as the "Computer Group." *Id.* Hern recited a long sequence of arrests involving Nolan for various bookmaking activities beginning in 1961 and continuing through February 1991. *Id.,* ¶ 12(a)-(*l*). Hern was also aware that Nolan's date of birth is January 30, 1930. *Id.,* ¶ 12. Based on this information, Hern maintained that the Buffalo gambling organization was related to the gambling operation maintained by Nolan in Las Vegas. *Id.,* ¶ 12. Thus, Hern's application sought a warrant whose purpose was to determine the entire extent of the gambling conspiracy under investigation, the existence of which was supported by probable cause, not to permit a nation-wide dragnet based on mere suspicion.

Therefore, Hern's affidavit submitted in support of the January 27, 1996 Intercept Order sufficiently demonstrated a connection between Nolan's Las Vegas gambling operation and the suspected gambling operation under investigation in this district such that the Intercept Order was not requested in an attempt to circumvent normal investigative techniques so as to implicate Nolan and others involved in unrelated conduct.

In the Intercept Affidavit provided in support of the February 28, 1996 Intercept Order, Agent Hern incorporated all the reasons contained in the affidavit submitted in support of the January 27, 1996 Intercept Order as discussed above. Hern Affidavit in Support of February 28, 1996 Intercept Order, ¶ 36. Agent Hern also asserted additional reasons in support of the second Intercept Order including that as the criminal activity under investigation involved an organization extending from Las Vegas to Buffalo, it could take years to complete the investigation using normal investigative techniques. Hern Affidavit

in Support of February 28, 1996 Intercept Order, ¶ 36(a). Although the investigation to date had disclosed that money intercepted from the alleged criminal activity was stored in a safe deposit box and that use of a money laundering scheme was being contemplated, the exact location of that box was not known and the money laundering conspiracy was then "embryonic." *Id.,* ¶ 36(b). According to Agent Hern, use of normal investigative techniques were likely to alert the investigation targets, allowing them to empty the safe deposit box before its location could be learned and probable cause to search and seize the contents developed. *Id.* Further, Agent Hern believed that use of only normal investigative techniques would result in some participants in the criminal organization remaining unidentified. *Id.,* ¶ 36(c). Therefore, that normal investigative techniques were unlikely to succeed in obtaining the identity the full extent of the of the gambling activity under investigation was demonstrated by Hern's affidavit submitted in support of the February 28, 1996 Intercept Order.

Kaczowski also challenges the need for any continuation or extension of the January 27, 1996 Intercept Order, Greenman Affidavit at ¶ 46, and also maintains that Agent Hern, in applying for the February 28, 1996 Intercept Order, failed to explain why this additional such order was expected to succeed in obtaining the identity of other "Buffalo area beard and bookmakers that the Millersport gambling interceptees are using to place wagers with or using to place wagers through." Greenman Affidavit at 25 (quoting Hern Affidavit in Support of February 28, 1996 Intercept Order, ¶ 48). However, a fair reading of the 10–day reports filed under seal with regard to the January 27, 1996 Intercept Order and Hern's affidavit in support of the February 28, 1996 Intercept Order indicates that it was reasonable to believe that continued electronic surveillance of the telephone lines would likely reveal the identity of

others involved in the alleged gambling organization.

Kaczowski also maintains that Hern's inclusion of a footnote in her affidavit in support of the February 28, 1996 Intercept Order indicating that FBI surveillance agents observed that the safe deposit box in which proceeds of the alleged criminal activity were believed stored was located at Marine Midland Bank is inconsistent with Hern's statement that the exact location of the safe deposit box was unknown. Greenman Affidavit, ¶ 47. However, that Hern may have been aware the safe deposit box was with Hong Kong Shanghai Banking Corp. (HSBC Bank) does not mean the exact location of the box was known. The court takes judicial notice that there are many branches of Marine Midland Bank located throughout the Western District of New York. Significantly, the statement referred to by Kaczowski does not indicate at which branch the safe deposit box was located or in whose name it was leased. Thus, more information was needed before a search warrant could be obtained with regard to the subject safe deposit box.

It is apparent that the interception of electronic communications between the targets of the investigations was necessary to obtain evidence as to the full extent of the organization, including the identity of all participants and the location of the proceeds of the alleged illegal activity as, based on Hern's affidavits submitted in support of the Intercept Order applications, alternative normal investigative techniques would not have been sufficiently productive or practical when the applications were made. Accordingly, Defendant Kaczowski's motion to suppress on the basis that the Government has failed to explain why normal investigative techniques would not be sufficient should be DENIED.

### c. *Probable Cause*

Defendant Kaczowski asserts that if the court determines the January 27, 1996 Intercept Order was properly issued upon a sufficient demonstration that normal investigative techniques were not likely to succeed in procuring the desired information, then, alternatively, that Intercept Order issued without probable cause.[10] Greenman Affidavit at ¶ 39. The thrust of Kaczowski's argument is that Hern's affidavits do not establish that the subject telephone lines were used to accept wagers, as opposed to placing bets and demonstrate that pen registers previously attached to those lines indicated more outgoing calls than incoming calls. *Id.*

It is well settled that the standard for assessing probable cause for an electronic intercept order is no different from that for a search warrant. *United States v. Fury, supra,* at 530. In determining whether probable cause exists, the issuing officer is simply to make practical, common sense decision whether, given the "totality of the circumstances" set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that evidence of a crime will be obtained through the use of electronic surveillance. *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). An affidavit in support of an application for an intercept order demonstrates probable cause when it sets forth facts which are sufficient, under the circumstances, to indicate a fair probability of criminal activity. *United States v. Rowell,* 903 F.2d 899, 902 (2d Cir.1990) (citing *Gates, supra,* at 236, 103 S.Ct. 2317). Fur-

10. Although Defendant Kaczowski only directly challenges the January 27, 1996 Intercept Order as issued without probable cause, he also maintains that insofar as the asserted probable cause for the February 28, 1996 Intercept Order was based on evidence obtained through conversations intercepted in accordance with the January 27, 1996 Intercept Order, as the earlier order was issued without probable cause, no probable cause existed for the latter order. Greenman Affidavit, ¶ 45.

ther, a judge's determination of probable cause should be given great deference by a reviewing court. *Gates, supra,* at 236, 103 S.Ct. 2317; *United States v. Nichols,* 912 F.2d 598, 602 (2d Cir.1990). The resolution of marginal cases should be determined by the preference accorded warrants. *Jones, supra,* at 270, 80 S.Ct. 725.

 A finding of probable cause may be based, in whole or in part, on hearsay from a reliable informant. *Gates, supra,* at 243–46, 103 S.Ct. 2317; *United States v. Smith,* 9 F.3d 1007, 1013 (2d Cir.1993). An inquiry into the reliability of an informant is usually of two general types: (1) an inquiry into the informant's veracity, and (2) an inquiry into the quality of the informant's source of knowledge, such as whether the information is based on first hand observations, as opposed to rumor or innuendo. *United States v. Wagner,* 989 F.2d 69, 72–73 (2d Cir.1993). In assessing a probable cause determination, "[t]he only questions for the Court are whether the [affiant's] reliance on that informant was reasonable, and whether the Magistrate was fully informed of all necessary facts when she made her finding of probable cause for the issuance" of the warrant. *Smith, supra.*

 In the instant case, Kaczowski's argument that pen registers indicated outgoing calls placed over the telephone lines subject to the Intercept Orders outnumbered incoming calls on those same lines demonstrates the lines were more likely used for placing, rather than accepting, gambling wagers is without merit. First, even if the mere placing of bets were legal, Kaczowski submits nothing in support of his contention that all outgoing calls were made only to place bets and ignores the fact that incoming calls were also registered as well as that Kaczowski has been

charged with bookmaking and profiting from an illegal gambling business.[11] Moreover, as discussed, under New York law, receiving a bet is illegal as it advances gambling via communications facilities. Discussion, *supra,* at 7–8. Second, as discussed below, the statements submitted in support of the January 27, 1996 Intercept Order are sufficient that a reasonable person could conclude that bookmaking activity, including the placing of bets and acceptance of wagers was occurring.

Hern's statements in her affidavit in support of the application for the January 27, 1996 Intercept Order demonstrate sufficient probable cause to support issuing that order. Specifically, statements within the affidavit advise that the information contained therein is based on knowledge gained by the affiant through her participation in the investigation, as well as from other FBI and law enforcement agents involved in the investigation of the case, information contained in official files relative to the case, multiple confidential and reliable informants, as well as through court-authorized electronic surveillance of bookmakers and known and suspected members and associates of organized crime within the Western District of New York and other parts of the country. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 3. In the affidavit, Hern recounts the events leading up to the current investigation including its origins with the investigation of a group of professional gamblers in Las Vegas, Nevada, in September 1995. *Id.,* ¶ 8. For example, FBI agents had verified that Nolan maintains at least six telephone lines at his residence in Las Vegas. *Id.* Based on information obtained through the FBI's investigation, including Hern, it was deter-

---

11. Kaczowski fails to explain why the disparity between the numbers of incoming and outgoing calls necessarily indicates the absence of bookmaking. Even if most of the outgoing calls were for the purpose of placing bets for the callers' benefit, such is not inconsistent with finding bookmaking as such calls may have also been for the purpose of influencing the line on events for which bets were being received or accepted at Suite 111. Thus, a reasonable inference is that criminality in the form of illegal gambling was occurring at Suite 111.

mined that Nolan had a history of participating in illegal gambling operations that extended over thirty years. Id., ¶¶ 12–13.

Hern also relied on information provided by confidential sources which was corroborated and verified as accurate by independent investigation including public records, telephone and pen register records, surveillance and the execution of the search warrant for Suite 111. Hern Affidavit in Support of January 27, 1996 Intercept Order, at 14. Such information included a confidential source located in Las Vegas ("LV# 1") who had advised that a group of individuals located in Las Vegas, Nevada, including one known as "The Swamp," whose real name is Eugene, and last name unknown, was involved in placing and laying off bets through the use of telephones and associates in several locations including Buffalo, New York. Id., ¶ 15. Individuals associated with the group in Buffalo included Joseph Zambito who at one time operated a business known as "Inside Lines" with Tony Berrafato. Id., ¶ 16. According to LV# 1, Zambito relocated to Las Vegas, however, where he worked with Nolan in a bookmaking organization with other bookmakers located throughout the United States, including Berrafato who remains in Buffalo. Id.

Another confidential source, BF# 1. who had provided reliable and accurate information since November 1995, informed Hern that Berrafato and one Lake were involved in a large-scale bookmaking operation in association with individuals in Las Vegas. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 17. Berrafato was the owner of Mississippi Mudds, a restaurant located at 313 River Road in Tonawanda, New York. Id. Lake was employed at Mississippi Mudds, and lived in an apartment behind the restaurant. Id. Lake was usually at the "office" which was Suite 111. Id., ¶ 18.

A third confidential source, BF# 3, who had provided reliable and accurate information since late 1995, advised Hern that he was a bettor who settled gambling debts with an employee of Mississippi Mudds, sometimes meeting the person at that restaurant. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 19. Another confidential source, BF# 2, ran up a large gambling debt in late 1995 which he refused to pay. Id. BF# 2 received a digital message on his pager instructing him to call telephone number "695–0509," the published telephone number for Lake at 396 Adam Street in Tonawanda, New York. Id. BF# 2 had operated as a bookmaker in the Buffalo area for a number of years and his reliability has been proven through independent investigation by Special Investigator Leslie E. King of the New York State Organized Crime Task Force. Id., ¶ 49.

Vehicles observed by FBI agents and New York Organized Crime Task Force investigators entering the parking lot at 1325 Millersport Highway during normal bookmaking hours [12] were determined registered to individuals or their spouses with histories of illegal gambling activities. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 44. Vehicles belonging to Berrafato, Lake and Paul and Robert Schintzius were observed on September 22, 1995. Id., ¶¶ 21–24. On December 16, 1995, Paul Schintzius was observed in the parking lot at 1325 Millersport Highway exiting from a rental car leased for the period December 13, 1995 through December 20, 1995 by Zambito who listed his address with the car rental agency as Las Vegas, Nevada. Id., ¶ 25. This same vehicle was observed parked in front of Berrafato's residence on December 19, 1995. Id. On December 21, 1995, Zambito and his wife were ob-

---

**12.** According to Hern, "normal bookmaking hours" are defined by Special Investigator King, based on fourteen years experience investigating organized crime and gambling, as weekdays from 6:00 P.M. to 7:30 P.M., Saturdays from 11:30 A.M. to 1:30 P.M. and 6:00 P.M. to 7:30 P.M., and Sundays from 11:30 A.M. to 1:00 P.M. and 3:00 P.M. to 4:30 P.M. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 14.

served at the Buffalo Airport boarding an airplane bound for Chicago. *Id.* A discarded airline ticket issued to Zambito's wife and retrieved from a trash receptacle at the airport contained flight information from a trip originating in Las Vegas on December 13, 1995, with a stop in Chicago and final destination of Buffalo. *Id.*

A vehicle registered to Nicholas M. Bolognese, who was convicted for violating 18 U.S.C. § 1955 in 1991 and who testified in federal court in 1994 that he had acted as a "beard" for a longstanding Buffalo area bookmaker, was seen in the parking lot at 1325 Millersport Highway.[13] Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 26. On November 27, 1995, a vehicle registered to Pepsi Cola, 2770 Walden Avenue, Cheektowaga, New York was observed in the parking lot at 1325 Millersport Highway although, based on the business directory for offices at that location, no legitimate business purpose was apparent. *Id.*, ¶ 30. Sidney Pastor, an officer of Pepsi Cola, Buffalo admitted to FBI agents on May 2, 1989 to being a customer of a bookmaking operation in 1987 and 1988. *Id.*, ¶ 30(a). Further, on December 21, 1991, Dennis Okun, an independent route driver for Pepsi Cola, Buffalo, was convicted by plea of violating 18 U.S.C. § 1955. *Id.*, ¶ 30(b).

On seven separate occasions between October 30, 1995 and January 22, 1996, a while male driving a vehicle registered to Shirley A. Franz, 849 Lee Avenue, North Tonawanda, New York, was observed during normal bookmaking hours exiting the parking lot at 1325 Millersport Highway and crossing the street to another parking lot where the man met for approximately eight minutes with an individual in another vehicle. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 29. According to Hern, meetings of such short duration are consistent with a bookmaker meeting with a customer to settle an account. *Id.* One Kenneth "Skippy" Franz,

also of 849 Lee Avenue, North Tonawanda, was convicted of illegal bookmaking activities in violation 18 U.S.C. § 1955 on October 28, 1994. *Id.* A similar meeting occurred on December 1, 1995, when Berrafato was observed crossing from the parking lot at 1325 Millersport Highway to a parking lot across the street where Berrafato met with an individual driving a vehicle registered to Ricardo J. Ross who was arrested on February 20, 1992 and charged with violating New York State Penal Code Article 225 pertaining to gambling offenses. *Id.*, ¶ 31.

Pen registers issued for the telephone lines maintained at Suite 111 indicated there were 2,177 incoming and 8,281 outgoing telephone calls over those lines, mostly during normal bookmaking hours, between November 17, 1995 and January 23, 1996. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶¶ 39–40. Among the outgoing calls were 67 to Franz, 93 to Bolognese and 11 to Zambito. *Id.*, ¶ 41(a), (b) and (g). Further, 567 calls were placed to telephone number (800) 816–3000, subscribed to by "Premier Access" of Miami, Florida. *Id.*, ¶ 41(*l*). A confidential source whose reliability has been demonstrated through the provision of accurate information to Special Investigator King for more than three years, identified that telephone number as belonging to a bookmaking operation located in the Dominican Republic and which is commonly used by Western New York bookmakers to lay off bets and by Western New York bettors to place bets. *Id.*, ¶ 41(e) and (*l*). A pen register installed on Berrafato's home telephone on January 12, 1996 indicated four calls were placed to Premier Access as of January 14, 1996. *Id.*, ¶ 42(c).

On December 1, 1995, Amherst, New York Police Officers collected the trash from outside Berrafato's home and discovered business records similar to those maintained by illegal gambling operations.

---

**13.** A "beard" is defined by Hern as "an individual acting as an undisclosed agent for a bookmaker" Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 26.

Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 34.

It was determined upon execution of a search warrant at Suite 111 on December 23, 1995 that all the telephones within that office had a speaker phone function consistent with bookmaking operations. Hern Affidavit in Support of January 27, 1996 Intercept Order, ¶ 36(a). The office decor was sparse and no signs of a legitimate business operation for public patronage were visible. *Id.,* ¶ 36(a) and (d). Office equipment observed in the single room office in Suite 111 included three desks, eight telephones, three desk-top adding machines, one television, one facsimile machine, one pencil sharpener, one 2-drawer filing cabinet. *Id.,* ¶ 36(a). Cards contained in a rolodex contained names, codes and telephone numbers which matched sports betting sheets found in the office. *Id.,* ¶ 36(b) and (c).

The statements contained within Hern's affidavit in support of the January 27, 1996 Intercept Order establish probable cause to believe an alleged gambling operation existed sufficient to support issuance of the order. Much of the information provided by confidential informants was independently corroborated by first-hand observations, thereby providing a reasonable basis to credit such informants' statements. *See Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (upholding probable cause determination where detailed information of criminality provided by a reliable informant, was independently corroborated by agent); *Wagner, supra,* at 73 (upholding probable cause determination where confidential informant provided detailed account of various activities witnessed inside defendant's home).

A reasonably prudent person reviewing this information could conclude that criminality, specifically, conducting an illegal gambling operation, was being facilitated through use of the subject telephone lines. Accordingly, the January 27, 1996 Intercept Order issued upon probable cause and

Kaczowski's motion to suppress on this ground should be DENIED.

### d. *Franks Hearing*

Defendant Kaczowski has also moved for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) on the ground that information materially relevant to the issuance of the Intercept Orders was omitted from the Hern Affidavit. Greenman Affidavit at 23, ¶ 42. Specifically, Kaczowski argues that when Agent Hern applied for the Intercept Orders, she already knew from other information received that the Zambito/Berrafato operation was placing numerous bets to other areas at their own initiative and, thus, it was equally possible that the alleged Berrafato/Zambito operation was not a wager receiving operation but a wager placing operation. Greenman Affidavit at 23, ¶ 41. The Government opposes the motion for a *"Franks* hearing" on the basis that Kaczowski has failed to meet the criteria including an "allegation of deliberate falsehood or of reckless disregard for the truth, ... accompanied by an offer of proof." Government's Response at 16 (quoting *Franks, supra,* at 171, 98 S.Ct. 2674).

On the record before the court, no *Franks* hearing is warranted. Under *Franks,* evidence seized pursuant to a search warrant based on materially false and misleading information is not admissible absent a hearing at which it is determined whether, setting aside the false statements, sufficient independent evidence was presented to the judicial officer such that the warrant was, notwithstanding the tainted information, issued on probable cause. *Franks, supra,* at 155–56, 98 S.Ct. 2674. A defendant is entitled to a hearing to test the truthfulness of a search warrant's underlying affidavits "only upon a 'substantial preliminary showing' that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions

were necessary to the [issuing officer's] probable cause finding." *United States v. Levasseur,* 816 F.2d 37, 43 (2d Cir.1987) (quoting *Franks, supra,* at 171–72, 98 S.Ct. 2674). Additionally, although an affidavit in support of a search warrant application may contain both lawful and tainted allegations, "a search warrant issued on the basis of such affidavit remains valid if probable cause is found based on an independent consideration of only the lawful information contained in the affidavit." *Franks, supra,* at 170–71, 98 S.Ct. 2674; *United States v. Ferguson,* 758 F.2d 843, 849 (2d Cir.), *cert. denied,* 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985). *Franks* has been limited to the statements contained in the affidavit based on the investigator's personal knowledge and does not extend to the information the informant may have provided to the applicant.

■ Kaczowski's argument that the information Agent Hern supplied in her affidavit in support of the Intercept Order application demonstrates that "there was the equal possibility that the Berrafato/Zambito alleged operation was not a wager receiving operation but, a wager placing operation" does not connote a material falsity, rather, it concedes that some type of wagering activity was being transacted. Whether Kaczowski engaged in wager placing or wager receiving, *see* Discussion, *supra,* at 7–8, is irrelevant as to whether Agent Hern intentionally supplied false information in her affidavit. Further, assuming, *arguendo,* that mere placing of bets was taking place, the other facts developed by the investigation were sufficient to show that bookmaking was also occurring. As such, there is no showing of a material falsity or reckless disregard of truth capable of having misled the issuing judicial officer.

Accordingly, there is no basis for a *Franks* hearing, and Defendant Kaczowski's request for one, should be DENIED.

### 4. *Suppression of Tape Recorded Conversations*

■ In his motion filed June 17, 1999, Defendant Kaczowski moved to suppress from use in evidence the content of tape recorded telephone conversations intercepted on March 26, 1996 between Kaczowski and others while Kaczowski was incarcerated at McKean Correctional Facility. Greenman Affidavit in Support of Motion to Suppress, ¶ 6. According to Kaczowski, the notices posted next to the correctional facility's telephones were insufficient to find that Kaczowski, by using the telephones, impliedly consented to the tape recording of his conversations. Greenman Affidavit in Support of Motion to Suppress, ¶¶ 7–11. Kaczowski further requests a hearing to determine the propriety of monitoring his telephone conversations while he was a federal prisoner. *Id.,* ¶ 12.

In contrast, the Government maintains that the notices posted next to the correctional facility's telephones advising users of the possibility that their calls would be monitored were essentially the same as those held by the Second Circuit as sufficient to find that use of such telephones demonstrated implied consent to monitoring of conversations. Government's Response to Defendant Kaczowski's Motion to Suppress Tapes of His Calls from the McKean Federal Prison Camp filed July 20, 1999 (Docket Item No. 22) ("Government's Response to Suppression Motion"), at 2–3 (citing *United States v. Workman,* 80 F.3d 688, 693 (2d Cir.1996)).

The signs at issue In *Workman, supra,* stated

### NOTICE

ALL INMATE TELEPHONE CONVERSATIONS ARE SUBJECT TO ELECTRONIC MONITORING BY DEPARTMENT PERSONNEL

*Workman, supra,* at 693.

Upon arriving at the correctional facility, the defendant was provided with an orientation handbook containing further no-

tification of the telephone monitoring program and the defendant signed a form indicating his receipt of the handbook. *Id.* Applicable state regulations provided further public notice of the program. *Id.* Further, tape recordings of the defendant's intercepted calls demonstrated the defendant was aware of the surveillance capabilities as he warned interlocutors the conversations may be monitored and appeared to speak in code to mislead listening authorities. *Id.* Nevertheless, the defendant argued that although he was informed of the prison's telephone monitoring program, he was never expressly informed either that his use of the telephone implied consent to surveillance or that such monitoring would include recording conversations. *Id.*

The court, relying on its previous opinion in *United States v. Amen,* 831 F.2d 373, 379 (2d Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988), inferred the defendant's consent to the tape recording of his telephone conversations from the circumstances which indicated his "plain awareness" of the possible surveillance when he chose to use the telephones. *Workman, supra,* at 693–94. Further, the fact that the defendant was not informed either by the signs placed near the telephones or the handbook that surveillance might include tape recording of the monitored conversations was of no importance as recording was simply the method of preserving information obtained by the electronic monitoring, requiring no additional notice. *Id.* at 694. Notably, the defendants in *Amen, supra,* were not overheard in the monitored calls expressing an awareness of the possible surveillance. *Amen, supra,* at 379.

Nevertheless, Kaczowski urges this court to find that *Workman* and *Amen* were incorrectly decided and conduct an evidentiary hearing to determine the propriety of monitoring his telephone conversations. Significantly, however, Kaczowski cites no authority in support of his request.

District courts must generally follow the law of their respective circuit. *See Ithaca College v. National Labor Relations Board,* 623 F.2d 224, 227 (2d Cir.) (citing cases and comparing an agency's duty to follow a circuit court's interpretation of statutes and regulations the agency administers with the district courts' obligation to follow circuit court precedent), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980). This court should not, absent convincing grounds to do so, intentionally refuse to follow applicable circuit precedent. In the instant case, the record demonstrates that Defendant Kaczowski was aware of the possibility that telephone conversations from the McKean Correctional Facility may be monitored. Specifically, the notices posted next to the telephones were at least as specific as those at issue in *Workman.* Photographs of these notices submitted by the Government in opposition depict the notices as being in bold-face font, placed closed to the telephones in obvious positions and not obscured. Government's Response to Suppression Motion, Exhibits A, B, C and D. Kaczowski does not challenge the accuracy of these submissions. Also, upon entering custody at the McKean Correctional Facility, Kaczowski executed an "Acknowledge of Inmate" form, Section 3 of which advises inmates of the prison's telephone monitoring program and that use of the telephone's constitutes consent to the surveillance. *Id.,* Exhibit E. Further, Kaczowski failed to submit an affidavit indicating that he was unaware his conversations would be recorded and, therefore, no factual issue for a hearing exists. *See United States v. Pena,* 961 F.2d 333, 337 (2d Cir. 1992) (holding defendant's allegations submitted in affidavit concerning interest in automobile searched sufficient to require evidentiary hearing in connection with suppression motion).

Under these circumstances and in accordance with *Workman, supra,* Defendant Kaczowski was sufficiently informed that his telephone conversations were subject to possible surveillance by prison authori-

ties. Therefore, his use of the telephones, despite being informed of the risk of monitoring and recording warrants imputing his consent to such interceptions. *Workman, supra.* As such, Defendant Kaczowski's motion to suppress use of his telephone conversations intercepted over the McKean Correctional Facility telephones should be DENIED without a hearing.

### CONCLUSION

Based on the foregoing, Defendant Masterana's motion to dismiss the Indictment (Docket Item No. 11) should be DENIED, and Defendant Kaczowski's motions to dismiss the indictment, and to suppress testimony from witnesses and evidence derived from interception of telephone conversations (Docket Item No. 14), and to suppress tape recorded conversations (Docket Item No. 21) should be DENIED.

Aug. 24, 1999.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendants.

SO ORDERED.